THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM EPHRAIM (Impleaded), Defendant-Appellant.

(No. 54732;

First District—June 4, 1971.

Gerald D. Mindell, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Themis N. Karnezis, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant was convicted after a jury trial of the offense of murder. Judgment was entered and he was sentenced to a term of twenty-five to

fifty years.* On appeal defendant contends: (1) that he was not proven guilty beyond a reasonable doubt since (a) the State's evidence as to identification is vague, uncertain, conflicting and contradictory and (b) the State's evidence is insufficient to prove him accountable for the offense charged; (2) that the trial court erred when it failed to grant his motion for a mistrial based on an improper polling of the jury; (3) that the trial court erred in refusing to grant his motion for a new trial based on the prosecutor's prejudicial comments; (4) that the trial court erred in denying his motion for discharge for lack of a speedy trial; (5) that the trial court erred by refusing to give an identification jury instruction; and (6) that he was denied a fair and impartial trial.

The testimony of the witnesses, particularly those which concerned the identification of defendant, may be summarized.

*Testimony of James Shead,* for the State:

He is eighteen years old and is a member of the Falcons, a branch of the East Side Disciples. On September 8, 1968, he was on the northeast corner of 65th and University at about 10:00 or 10:30 P.M. with ten or twelve other people. While he was standing on the corner, facing west, he saw a red Chevrolet coming east on 65th, but he could not recognize anybody in the car. However, as the car turned north on University he recognized Hairston. There were four or five other boys in the car but he could not recognize any of them. As the car began to make the turn he told everybody to look out and they started running. He saw Hairston, wearing a lime green short sleeve sweater, sitting in the front seat on the passenger side, start shooting. Five or six shots were fired. He did not see Booker Ransom, the decedent, get up.

The red Chevrolet proceeded north on University, and when the shooting stopped he ran towards Erin Evans' parked car. He got in the front seat passenger side, Raymond Thomas got in the back seat and Evans got in behind the driver's wheel. Arlene Mancil was already in the back seat when he got into the car. Evans' car had been in a wreck and the front left headlight was bent and shone on an angle. Evans had to drive with his brights on.

Evans' car proceeded north on University to 63rd Street and when Evans' car reached 63rd Street he saw the red Chevrolet stopped at a red light one block east at 63rd and Woodlawn. As Evans' car turned right on Woodlawn behind the red Chevrolet, he saw Hairston sitting in

---

* Defendant was tried jointly with co-defendant LeRoy Hairston (hereinafter "Hairston"). Hairston was also found guilty of murder by the jury and was sentenced to a term of seventy-five to one hundred and fifty years; he filed his appeal in the Supreme Court.

the front seat by the door, the same position as when he saw Hairston when the red Chevrolet was turning left at 65th Street. The red Chevrolet turned left on 64th at Woodlawn and Evans' car followed. At this time he saw defendant sitting in the back seat behind the driver. The red Chevrolet speeded up and traveled about five blocks east on 64th until it made a right turn at Blackstone. Evans' car could not make the turn and returned to 65th and University where he saw Booker Ransom lying in the street. The police arrived about a minute later and the witness spoke with the officers. Later that night he went to Billings Hospital and then to the police station where he gave and signed a written statement.

He knew defendant for about two years and had seen defendant more than two hundred times. He did not identify a red Chevrolet after September 8th. He saw one but he could not identify it.

On cross-examination he admitted making and signing a two page statement to the police on the night of the shooting of Booker Ransom. He also made a statement to the police upon returning to the scene of the shooting. He discussed with the policeman what happened and what he observed. He later gave the written statement answering the questions put to him "freely and willingly." He said, "I told them everything I knew about the occasion." When he spoke to the police the night of the shooting and in his written statement, he told them that he could recognize only one occupant of the red Chevrolet, Hairston. He only described Hairston. He added defendant's name as an occupant of the car when he testified before the Grand Jury.

On re-direct he stated that he knew that defendant had two brothers, one who uses a different name, Elton Wicks, and that he knew defendant was Wicks' brother.

On re-cross he testified that in his signed statement he said Evans' car followed the red Chevrolet to 64th and Blackstone and that he got a good look at Hairston but he could not make out who the other passengers were. He added defendant's name when he saw defendant and recognized him the next night at the police station.

*Testimony of Erin Evans,* for the State:

He was on the northeast corner of 65th and University at about 10:30 P.M. on September 8, 1968, when a red Chevrolet turned the corner and James Shead told everybody to look out, and about five or six shots were fired from this red car. He did not see who fired the shots. He jumped into his car along with Shead and Raymond Thomas; a girl named Arlene was already in the car.

His testimony as to the route followed in pursuing the red Chevrolet was essentially the same as Shead's. He could not see how many people were in the red Chevrolet. He saw Hairston twice during the pursuit,

once at 63rd and Woodlawn, where the lighting was good, and again when the red car turned off 64th at Blackstone.

He knew defendant for about nine years but he did not see defendant on the night of September 8th. His car had been in a wreck and his right front light was "all jiggled up." He had to use his brights which were on when he made the turn at Woodlawn.

*Testimony of Raymond Thomas*, for the State:

On September 8, 1968, he was a member of the Falcons, a branch of the East Side Disciples. About 10:15 P.M. on September 8th he was on the corner of 65th and University with about ten or twelve other people. He heard James Shead say, "Get low" and then he saw a red 1964 Chevrolet which was traveling east on 65th. As the red Chevrolet was about to turn he saw Hairston in the front seat passenger side, and defendant, somewhere in the back. He heard defendant say, "Blackstone, kill them all." He then saw someone's hand come out of the front seat passenger's side with a gun and begin to shoot. After the shooting stopped he ran to Evans' car. Arlene, Larry, Shead and Evans were in the car with him. He got in the back seat with Arlene.

The next time he saw the red car was at 63rd and Woodlawn but, "I could not see any of the people in the red car at that time." After the red Chevrolet turned east on 64th and Evans followed, he saw Hairston turn around. He did not see defendant at this time. He saw defendant as defendant turned around when the red Chevrolet reached Kenwood. After Evans' car returned to 65th and University he went home. He did not go to Billings Hospital or to the police station.

During the evening of September 9th he was with Ford Ransom, the decedent's brother, at 65th and University when he saw defendant and he told the police. The police stopped the car that defendant was in. Later he went to the police station and gave and signed a written statement.

On cross-examination he testied that when he was in Evans' car he sat in the back seat on the right hand passenger side. When he first saw the red Chevrolet from Evans' car he stuck his head out of the window and saw one person turn around. He then put his head back inside the car and saw the other person (defendant). He could see through Evans' windshield and through the red Chevrolet's back window. Both cars were going "kind of fast." Evans never used the spotlight on his car but he did use his brights which shone straight ahead. Evans turned on his brights at 63rd and Woodlawn. Evans' car was in good condition.

When the red Chevrolet approached 65th and University someone said "get low" and he hit the ground and held his head down. He did not see the red car then.

On September 9th he gave a statement to the police which stated that he was standing on the northwest corner of 65th and University when he saw a car driving west on 65th Street.

He did not see what defendant was wearing on September 8th. He first saw defendant at 63rd and Woodlawn and then he later saw him again. He did not see defendant before 63rd Street.

He went to grammar school with defendant for one year some time prior to 1966, but he could not remember the last time he spoke to defendant.

On re-direct examination he testified that when he saw the red Chevrolet at 65th and University he heard defendant yell. "I didn't see him [defendant]. I heard him. I know his voice." He first saw defendant at 63rd and Woodlawn. He did not see defendant at 65th and University.

*Testimony of Jacob Shaw,* for the State:

He was on the northeast corner of 65th and University at about 10:00 or 10:30 the evening of September 8, 1968. He saw a red Chevrolet coming east on 65th Street very fast and heard James Shead say, "Watch it. Run." As the red Chevrolet turned the corner he heard somebody holler, "Blackstone," and shots went off. He was wounded by one of the shots. He was not able to identify any of the occupants of the red car.

*Testimony of Arlene Mancil,* for the State:

She was on the corner of 65th and University at about 10:30 at night on September 8, 1968. She was in Evans' car when she saw the flashing of lights, that the red car turned the corner and somebody started shooting. She heard some holler, "Blackstones" and then there was shooting, Evans, Shead and Thomas jumped into Evans' car. Thomas went to the left hand side back while she sat on the right hand passenger side. She ducked down during the pursuit and could not identify any of the occupants of the red car.

*Testimony of Thomas Manella,* for the defense:

He is assigned to Area 2 Homicide as a detective. On September 9, 1968, he was assigned to the Booker Ransom homicide. He arrested defendant on September 9. After taking a statement from Raymond Thomas, defendant was not charged with any offense and he was released.

On the following day he went to the Ephraim residence. He found Mrs. Louise Ephraim at home but defendant was out. He asked Mrs. Ephraim to contact him when defendant returned. He received a call from Mrs. Ephraim at the police station, when to the Ephraim home and took defendant into custody.

On cross-examination he testified that when he spoke to Assistant State's Attorney Beranek on September 10, 1968, he then went out and arrested defendant. He never spoke with Beranek on September 9 but

rather talked to Assistant State's Attorney Saydek before he released defendant.

*Testimony of Louise Ephraim,* for the defense:

She is defendant's mother. She testified essentially to the same sequence of events as Detective Manella which led to defendant's arrest. Defendant lived with her at 611 East 47th Street on September 8, 1968. During the evening of September 8th she was watching television by herself until about 10:30 P.M. when defendant came home. She was watching the news to see if the bus strike was over.

On cross-examination she testified that defendant came home some time before 10:30 with his two brothers, John and Jacob.

It was stipulated that Hairston was twenty-one years old and that defendant was seventeen years old.

*Opinion*

Defendant contends that he was proven guilty beyond a reasonable doubt. He argues that the State's evidence as to his identification is vague and uncertain, and that the witnesses' testimony is conflicting, contradictory and self-impeaching. The State proffered the testimony of five occurrence witnesses to the murder of Booker Ransom. Erin Evans testified that James Shead, Raymond Thomas, Arlene Mancil and he used his car to pursue the red Chevrolet. However, Evans also testified that he did not see defendant during the night of September 8, 1968. He could only identify Hairston as an occupant of the red Chevrolet. Arlene Mancil also testified that she could not see who was in the red Chevrolet. Jacob Shaw, another of the five occurrence witnesses, testified that he was on the corner of 65th and University when he saw the red car turn the corner. As he was running he was shot in the heel. He was unable to see the occupants of the red car.

Only two of the five occurrence witnesses, James Shead and Raymond Thomas, testified concerning the identification of defendant as a participant in the murder of Booker Ransom. Both witnesses were positive in their testimony that defendant was in the back seat and that the shots were fired by Hairston from the front seat. It is their identification testimony that defendant claims is vague and uncertain and conflicting, contradictory and self-impeaching. Shead's only testimony identifying defendant was his single observation of defendant in the red Chevrolet at 64th and Woodlawn. However, on cross-examination and again on re-cross Shead testified to making two voluntary statements to the police after the occurrence when he discussed what happened and what he observed. In both statements he told the police that he could only identify and describe Hairton as an occupant of the red Chevrolet and that he could not recognize anyone else in the car. Shead admitted

that he added defendant's name when he testified before the Grand Jury. "I added that I saw Ephraim after I gave the first two statements." He added defendant's name after he saw defendant at the police station the night of September 9, 1968 (when defendant was first arrested by Detective Manella and then released).

On re-direct examination in an attempt to explain why he later added defendant's name, Shead testified that defendant had two brothers and that he knew defendant was Elton Wicks' brother but he did not know defendant's name. This explanation does not rebut the fact that Shead told the police on September 8th that he could identify only Hairston as an occupant of the red car, even though Shead allegedly knew defendant for about two years and had seen him over two hundred times.

■■ The State argues that Shead's identification testimony is sufficient and "[t]he People 'find it interesting to note' that the defendant never attempted to rebut the explanation" given by Shead as to his failure to name defendant as a participant in the murder of Booker Ransom on September 8th. However, on September 8th Shead did not tell the police he recognized an occupant of the red Chevrolet besides Hairston but did not know this person's name. Rather, Shead testified that he could identify only one occupant of the vehicle, Hairston, and could not identify anyone else. Furthermore, Shead's explanation as to why he added defendant's name before the Grand Jury need not be rebutted by the defense as the State suggests. In order to sustain a conviction the State must prove beyond a reasonable doubt that the crime was committed and that defendant committed the crime. (*People v. McGee*, 21 Ill.2d 440.) The State had ample opportunity to corroborate Shead's explanation through its own witnesses or during cross-examination of Mrs. Ephraim. The State chose to do neither.

We note that on cross-examination Mrs. Ephraim testified that defendant was home during the time of the shooting with his two brothers, John and Jacob. No mention was again made of Shead's "Elton Wicks" during the trial testimony.

The other occurrence witness who identified defendant was Raymond Thomas. He testified that on the evening of September 8, 1968, he was standing on the northeast corner of 65th and University when he heard James Shead say, "Get low"; that he observed a red Chevrolet at 65th and Greenwood, traveling east; that as the car was ready to turn the corner he saw Hairston and defendant in the car; that defendant was in the back; that he heard defendant say, "Blackstone, kill them all"; that a hand came out of the front passenger side window with a gun and started to shoot; that after the shooting ended he got up and ran to Evans' car and sat in back with Arlene; that the next time he observed

the red car it was at 63rd and Woodlawn but he could not see any of the people in the red car at that time; that when they got to Kenwood defendant turned around; and that he did not go to the hospital or the police station that night.

On cross-examination Thomas testified that he sat in the rear seat of Evans' car on the right hand passenger side; that he saw defendant through Evans' windshield and through the back window of the red car at 64th and Kenwood as the red Chevrolet was "going kind of fast because it was trying to get away from us"; that Evans' car was in good condition; that Evans turned the headlights on bright at 63rd and Woodlawn; and that the headlights on Evans' car shone straight ahead.

Thomas' testimony is contradicted by that of Arlene Mancil, James Shead and Erin Evans. Arlene testified that *she*, not Thomas, sat on the right hand passenger side in the back of Evans' car and that Thomas was to her left. Further, Shead testified that Evans' car had been in an accident; that the left headlight was bent; and that Evans had to drive with his brights on which shone at an angle. Evans' testimony corroborated the condition of his car as related by Shead: it had been in a wreck, the front light was broken and his brights were already on when he turned down Woodlawn.

Thomas' own testimony is also contradictory and conflicting. At various times on cross-examination, re-direct and re-cross he testified that he did not observe defendant in the red car at 65th and University as he testified to on direct, but that he first saw defendant in the car at 63rd and Woodlawn. On cross-examination Thomas stated that when the red car approached 65th he heard someone holler, "Get low." He got low and did not see the red car. He hit the ground and held his head down. Thomas also testified on cross-examination that the first time he saw defendant was at 63rd and Woodlawn. He did not see him before that.

On re-direct and in response to questioning by the prosecutor Thomas once again stated that the first time he saw defendant was at 63rd and Woodlawn:

"Q. You didn't see Mr. Ephraim before you got in Erin's car?

\* \* \*

The Witness: No, I don't think so."

The unreliability of Thomas' testimony is apparent since he, himself, impeached his prior identification testimony. On direct examination he stated that he saw defendant in the back seat of the red Chevrolet as it was about to turn at 65th and University and that during the pursuit of the fleeing red car he observed it at 63rd and Woodlawn but he could not see any of the people in the car at this time. Thomas' later testimony completely contradicts and impeaches these statements.

■■ As the court in *People v. Barfield,* 113 Ill.App.2d 390, 395, stated:

"The credibility of the witnesses and sufficiency of the evidence are matters within the province of the trier of fact, and his determination will only be disturbed if the necessary degree of proof is lacking. *People v. Hansen* (1963), 28 Ill.2d 322, 192 N.E.2d 359. However, the testimony of a witness may contain its own impeachment and may be so improbable as to be disregarded."

In an attempt to rehabilitate Thomas' testimony, Thomas was asked by the prosecution if he heard anyone yell from the red car at 65th and University and he answered, "Yes." He was then asked:

"Q. Who yelled?

A. William Ephraim.

Q. When's the first time you saw William Ephraim then?

A. I didn't see him. I heard him. I know his voice."

However, on re-cross Thomas was asked:

"Q. Earlier. When was the last time that you talked to William Ephraim before—prior to September 8?

A. I didn't."

Arrayed against this vague and uncertain identification testimony was defendant's alibi as related by Mrs. Ephraim which covered the time during which the shooting of Booker Ransom was committed.

■■ Although it is true that the testimony of a single witness, if positive and the witness credible, is sufficient to convict, (*People v. Keller,* 128 Ill.App.2d 401) in the instant case the identification of defendant by Shead and Thomas was weakened by (1) the conflicting and contradictory nature of their testimony; (2) Shead's explanation of why he added defendant's name as a participant in the murder after his statements to the police that he could identify only Hairston; (3) Thomas' abandonment and denial of his direct testimony as to his identification of defendant at 65th and University and subsequent self-impeaching statements reciting a completely different identification sequence of events; and (4) the poor opportunities which both Shead and Thomas had to observe defendant in the back seat of the speeding Chevrolet.

In *People v. Gardner,* 35 Ill.2d 564, 571, the court, in discussing the strength of the State's identification testimony as compared to defendant's alibi, stated:

This court has often held that: "In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused. * * * And while the identification and whereabouts of the defendant at the time of the crime are questions for

the jury, yet, where from the entire record there is a reasonable doubt as to the guilt of the accused, a judgment of conviction will not be permitted to stand. (*People v. Ricili,* 400 Ill. 309; *People v. Gold,* 361 Ill. 23.) Where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, it will be reversed. (*People v. Fiorita,* 339 Ill. 78; *People v. Kidd,* 410 Ill. 271.) Neither can we disregard the evidence of alibi where the sole and only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime. *People v. Peck,* 358 Ill. 642; *People v. De Suno,* 354 Ill. 387." *People v. McGee,* 21 Ill.2d 440, 444.

■■ In the instant case we find that the identification testimony of Shead and Thomas was "not of that clear and convincing quality required to sustain a conviction," *People v. Coulson,* 13 Ill.2d 290, 298, and since the State failed to introduce any other evidence connecting defendant with the crime, we find that he was not proven guilty beyond a reasonable doubt.

As we have concluded that the evidence produced by the State did not support defendant's conviction, it is unnecessary to discuss defendant's other contentions.

The judgment is reversed.

Judgment reversed.

ENGLISH, P. J., and LORENZ, J., concur.