THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MELVIN McKIBBEN, Defendant-Appellant.

(No. 57810;

First District (2nd Division)—December 3, 1974.

Jack P. Rimland, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Barry Rand Elden, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This was a prosecution for murder and attempt to rob. Defendant waived trial by jury, and, on the day of his trial, he filed a motion to suppress the State's identification evidence. The motion was heard contemporaneously with presentation of the prosecution's case. Defendant did not testify, and, with the exception of one exhibit introduced to impeach the State's principal witness, he did not offer any evidence in his defense. His motion to suppress was denied, and he was found guilty of murder. Thereafter, the trial court overruled post-trial motions, heard evidence in aggravation and mitigation and sentenced defendant to serve 20 to 30 years. The issue in this appeal is whether he was proven guilty beyond a reasonable doubt.

I.

At about 1:15 A.M. on September 25, 1971, James Johnson, Suzy Foushee and Roscoe Robinson were entering a building at 4753 South Indiana Avenue in Chicago. Inside was a vestibule and then a door that opened to the stairway to a basement below the street level of the building. Suddenly, while the three were in the vestibule, two men entered behind them. Johnson, who was about to open the door to the basement, heard the noise and, thinking that something strange was happening, rushed down the stairs. Suzy Foushee, without looking at the two men, ran back to the street and, in the company of a man and a woman who were standing nearby, took refuge in an apartment house next door. Johnson, in the meantime having reached the basement, heard either two or three shots. A few moments later, a man armed with a gun came down the basement stairs and, for "seconds" or "three minutes," stood within 3 feet or at most 3 yards of Johnson. As a result, he had an opportunity to observe the armed man. After taking a jacket that Johnson was carrying and patting it, the man ran back upstairs in response to a second man who called, "Come on, man, let's go!" Johnson followed the man upstairs, and the two intruders then ran out of the building. Moments later, Johnson found Roscoe Robinson lying on the stairs, wounded by a gunshot that instantly caused his death.

That night, Johnson went to a police station where he was questioned and shown three books of photographs but was unable to identify anyone. However, a week later, while an inmate in the Chicago House of Correction, he was interviewed by two policemen, Frank Baxter and Albert J. Jordan. At their request, he picked out one of five police photos which he said showed one of the two men who entered the building at 4753 South Indiana Avenue in the early morning hours of September 25, 1971. Johnson was released from the House of Correction; and on November 10, 1971, sometime between 4 and 5 P.M. he was shown a picture by a Chicago policeman. Later that afternoon, Johnson called Officer Frank Baxter and told him he had seen a picture of the man who shot and killed Roscoe Robinson. At about 10 P.M. on November 10, Baxter, acting on this information which he supplemented with data from police files, arrested the defendant. He was taken to a police station and placed in a five-man lineup. Johnson was brought to the station and identified defendant as "the light complected guy who was in the Roscoe Robinson killing * * *." That same evening, Johnson gave the police a written statement in which he described how he first saw defendant's picture and said that he had never seen defendant before, "except when he stuck me up and killed Roscoe."

Later, at defendant's trial for the murder and attemped armed robbery of Roscoe Robinson, the occurrence of the felony murder was not disputed. Johnson, Suzy Foushee and two Chicago policemen testified for the State. After hearing one witness in support of the motion to suppress the State's identification evidence, the trial court found that the photo identification of defendant by Johnson, after a Chicago policeman showed him one police photo, had "* * *" some taint involved in the showing of a single photograph * * *." But the court denied defendant's motion to suppress. Johnson was the only witness who identified him as the man who shot and killed Roscoe Robinson.

## II.

■■ One witness who makes a positive identification of an accused, a witness who had ample opportunity to observe the accused at the time of a crime, may furnish evidence that is sufficient to support a conviction. (*People v. Guyton*, 53 Ill.2d 114, 117, 290 N.E.2d 209; *People v. Cook*, 18 Ill.App.3d 190, 309 N.E.2d 623.) However, a conviction is not supported by sufficient evidence, that is, proof beyond a reasonable doubt, if the identification of an accused is vague, doubtful and uncertain. (*People v. Cullotta*, 32 Ill.2d 502, 504, 207 N.E.2d 444.) And where, as in a case like this one, the identifying witness admits that before the crime he had never seen the accused, the attendant circumstances, in-

cluding the opportunity for definite identification, must be carefully weighed and considered. *People v. Betts,* 101 Ill.App.2d 322, 243 N.E.2d 282.

■■ The record before us discloses that on the day of defendant's trial, Mr. Lawrence Bolon, the assistant State's Attorney in charge of the prosecution, informed the court and his opposing counsel that James Johnson and Suzy Foushee were narcotic addicts and that Johnson had sight only in his left eye. We pause to observe that this voluntary disclosure of information adverse to the State's case was conduct consistent with the highest tradition of our profession. It is this kind of candor and forthrightness that should always characterize the conduct of a lawyer who speaks for the People in a criminal case. See *People v. Higgs,* 11 Ill.App.3d 1032, 298 N.E.2d 283; compare *People v. Rice,* 109 Ill.App.2d 212, 248 N.E.2d 332.

However, dispite these disclosures concerning him, when James Johnson testified, he denied he was a narcotic addict. And at first, he denied there was anything wrong with his sight. It took persistent cross-examination to elicit from him the fact that for a year and a half he used heroin, which on occasion cost him $20 a day. Then, after some questioning on the same subject, Johnson admitted that the evening before Robinson was killed, he had waited for him so they could go get some drugs. Defendant's counsel, inquisitive about Johnson's condition at the time of the crimes, asked him if he had taken any heroin the evening before he witnessed the events of his testimony. He denied that he had. But Suzy Foushee, his companion, testified for the State and contradicted him by saying that sometime between 8 and 9 P.M. of the evening before the events involved, she and Johnson had heroin together, a drug use from which she was recovering at the time of the shooting. Johnson, although admitting long and continued use of the drug, insisted he was not addicted to heroin. And based on this testimony, the trial judge concluded that Johnson was not an addict; he was a user of narcotics.

■■ However, the definition of "addict" contained in our Controlled Substances Act, the statute that prohibits drug abuse in this state, is broad enough, in our judgment, to include a user of narcotics. "'Addict' means any individual who habitually uses any controlled substance so as to endanger the public morals, health, safety or welfare, or who is so far addicted to the use of controlled substances as to have lost the power of self-control with reference to his addiction." (Ill. Rev. Stat. 1971, ch. 56½, par. 1102(a).) Therefore, from Johnson's testimony, including his admission that he was using heroin until a month before he testified in this case, we conclude that at the time of the crimes in question, he was

a narcotic addict. See *People v. Garcia* (1968), 256 Cal.App.2d 570, 64 Cal.Rptr. 370; *United States v. Lindsey* (D. C. D. C. 1971), 324 F.Supp. 55, 59.

Johnson also insisted that there was nothing wrong with his vision. But having been informed that Johnson was blind in his left eye, defendant's counsel pressed him about it; and after pointed cross-examination, Johnson admitted that when he was about 7 years of age, he was hit in his left eye with a board and completely lost all vision in that eye. Although he was being asked about his ability to see, Johnson persisted in saying about his left eye that "I don't have no trouble with it. I just can't see out of it."

In addition to questions concerning his use of drugs and his ability to see, Johnson was asked about the state of his sobriety at the time of the events about which he was testifying. He showed no reticence in this connection. He readily admitted that at the time Robinson was shot, he was "high" on alcohol, having shared a half-pint of vodka with three friends.

The vestibule of the building into which Johnson, Suzy Foushee and Roscoe Robinson were entering in the early morning hours of September 25, 1971, was illuminated by a 50- or 60-watt bulb. The stairway to the basement had no light. Illumination for the area was furnished by a light-bulb at the foot of the stairs and one in a kitchen nearby. According to Johnson, he rushed down the stairs to the basement when he heard the noise made by the two men intruding on him and his companions. He did not look at them, but in the basement, he had either some seconds, three minutes or the time it took the man to take a jacket from him, pat it and run back upstairs because the other man was calling. Johnson did not see the man whom he said remained upstairs.

Johnson testified that on the night following Robinson's murder, he went to a police station where he was shown three books of photographs but was not able to identify anyone. He described an interview by a police officer to whom he gave a description of the man he saw that morning in the basement of 4753 S. Indiana Avenue. That man, Johnson said he told the officer, was in his mid-twenties, 5' 11" tall, weighed about 165 pounds, was light complexioned, wore his hair in an Afro natural style, was dressed in a wet-look brown jacket, had on a brown tam that had white stripes and a ball on top, and wore small, round, tinted glasses with silver frames. Further, Johnson said, he spoke to a police artist to whom he gave his description of the man and later saw the artist's rendition.

Johnson was asked if his description was in a written statement. He said it was. Defense counsel demanded production of the statement.

However, the assistant State's Attorney in charge said he did not have it. Officer Baxter, the principal investigator in the case, testified that although he had seen a statement he believed was given by Johnson the night of September 25, 1971, he could not locate it. Baxter did not say he ever saw the description which Johnson said he had given the police. The assistant State's Attorney, when pressed for production of the statement, told the court that "[i]f there is such a statement, we have no knowledge." Therefore, the statement described by Johnson was not produced; nor does the record reflect the existence of any police artist.

On October 1, 1971, Johnson as shown by his testimony, was in custody on a criminal charge. He was interviewed by police officers Albert J. Jordan and Frank Baxter who were investigating the killing of Roscoe Robinson. In a written statement, Johnson told them that when he, Foushee and Robinson were entering 4753 South Indiana Avenue the morning of September 25, 1971, he saw two men sitting in front of the building, one a "light dude." The investigators then showed Johnson five official police photos and asked him if he recognized anyone shown in the pictures. Johnson picked out one, saying that "this is the light dude [the man he saw in the basement] that was with the other dude  *  *  * when Roscoe was shot." Johnson was asked if he was certain this was the man, and he said he was. He was asked why he was certain, and he replied, "I've seen him around 47th Street and around Indiana Avenue before. I just didn't know who he was." The man whose picture he selected, however, turned out to be a James Brown who, sometime between September 25, 1971, and October 11, 1971, was killed in an armed robbery shoot-out in Chicago. Therefore, it appears that when Johnson said he was certain of his photo identification of the light-complexioned man who confronted him in the basement, he picked out the wrong man.

Moreover, we notice that Johnson's October 1 statement contradicted what he said at defendant's trial. In his testimony he said that the two men he saw in front of 4753 South Indiana Avenue on the morning in question were strangers, men he did not know. In his statement he told the officers that he knew one of the men, the one he testified was the defendant. In his testimony he said that he never had an opportunity to see the man who remained upstairs. In his statement he told the officers that the man who came to him in the basement was a "light dude" who was armed with a nickel-plated gun; the man who remained upstairs was a "dark dude [who] had a blue steel one."

■■ The trial court, after oral findings, ruled that Johnson was a credible and believable witness. In reviewing a conviction after a non-jury trial, we attach great weight to the findings of the trial judge, including his appraisal of the witnesses and their credibility. But his findings are not

conclusive, and it is this court's duty to set aside a conviction where the evidence is so unsatisfactory that it leaves a reasonable doubt of the defendant's guilt. *People v. Charleston*, 47 Ill.2d 19, 264 N.E.2d 199; *People v. Poltrock*, 18 Ill.App:3d 847, 310 N.E.2d 770.

In this case, we notice that defendant was identified by Johnson only after he was shown one photograph by police officer James T. Breckenridge, who at the time was on a routine robbery investigation. Breckenridge knew Johnson as "* * * one who frequents the street in the narcotics field." From his testimony, it is obvious that when Breckenridge displayed the photo, what he said to Johnson suggested he was trying to connect defendant with a robbery. In fact, this much is implicit in the trial judge's finding that the photo identification procedure had "* * * some taint involved in the showing of a single photograph * * *" to Johnson.

After this photo showup, Johnson called Baxter and told him he had seen a picture of the man who shot and killed Roscoe Robinson. Relevant, therefore, is Johnson's condition at the time of the suggestive photo showup and the lineup procedure that followed. Concerning this, Breckenridge was asked whether Johnson was under the influence of any narcotic drug when he saw him on the afternoon of November 10, 1971. Breckenridge answered, "I wouldn't say yes and I wouldn't say no. He appeared stable to me. He could have been." Baxter, who took Johnson to the police station for the lineup identification of defendant, was asked, "In your opinion, was [he] under the influence of any narcotic drugs on November 10, 1971, when you first saw him?" Baxter answered, "That is difficult to say, sir." When he was asked to explain his answer, Baxter said, "Well, in dealing with addicts on the street, there are only various obvious symptoms, when they go into a deep nod, when they get violently sick when they are withdrawing. Other than that, there is no way of actually telling without a medical examination whether at that particular point they are under the influence or not." Baxter was then asked if he noticed any of these symptoms in Johnson before the lineup identification. His answer was, "No, Sir." However, investigator Michael Caccitolo, who was with Baxter when Johnson made the lineup identification and signed the written statement, testified that after the lineup procedure Johnson "[s]tarted to get a head cold appearance, the type of head cold a person has when he is going into withdrawal." When asked what else he had noticed about Johnson's appearance, Caccitolo replied, "Well, just the fact that he appeared to be going into withdrawal."

In *People v. Strother*, 53 Ill.2d 95, 290 N.E.2d 201, the supreme court stated the rule that "* * * the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become no-

torious liars." (53 Ill.2d 95, 99.) This rule is supported by a long line of Illinois cases. (See *People v. Crump*, 5 Ill.2d 251, 125 N.E.2d 615; *People v. Boyd*, 17 Ill.2d 321, 161 N.E.2d 311; *People v. Bazemore*, 25 Ill.2d 74, 182 N.E.2d 649.) It has meaning for the case before us. And with it in mind, we have examined Johnson's entire testimony and compared it with the two photographs of the lineup from which he picked out defendant as the light-complexioned black man who confronted him in the basement of 4753 South Indiana Avenue on the morning that Roscoe Robinson was shot and killed. In both photographs, defendant is fourth man from the left. They show that defendant is a dark-complexioned black man. On the other hand, visual examination of each photo reveals that the first man in the lineup is a light-complexioned black man. Nothing in the record explains this discrepancy between defendant's appearance at the lineup and Johnson's description of the man he said he saw on the occasion under inquiry.

■■ Defendant's possession of a pair of sunglasses when he was arrested does not help the State's case against him. The sunglasses were introduced in evidence and we have examined the description of them in the record. That description is nothing like the "* * * small, round, tinted glasses with silver frames * * *" which Johnson said were worn by the man he saw. We conclude, therefore, that the State's evidence in this case is so unsatisfactory that it raises a reasonable doubt of defendant's guilt. The judgment is reversed. *People v. Pellegrino*, 30 Ill.2d 331, 196 N.E.2d 670; *People v. Gardner*, 35 Ill.2d 564, 221 N.E.2d 232; *People v. Ephraim*, 133 Ill.App.2d 310, 273 N.E.2d 225.

Reversed.

HAYES, P. J., and DOWNING, J., concur.