THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MILTON JAKES, Defendant-Appellant.

First District (6th Division)   No. 1—88—1896

Opinion filed December 21, 1990.

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Jeanette Sublett, and Elizabeth McDevitt, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Both defendants Milton Jakes and Rhonda Taborn were charged by information with one count of armed robbery and two counts of aggravated battery. Although their cases were severed, they were tried in a joint bench trial. Taborn was acquitted on all counts. Defendant Jakes was found guilty of two counts of aggravated battery and acquitted of armed robbery. The trial judge merged the convictions for aggravated battery and sentenced defendant to two years' incarceration. Defendant's post-trial motion for a new trial was denied.

Defendant appeals his conviction and raises as the sole issue for review whether the evidence was sufficient to establish his guilt of aggravated battery beyond a reasonable doubt where his codefendant was acquitted of the same charges on the same evidence.

Neither defendant nor his codefendant Taborn testified at trial. The victim, Knowledge Williams, and John McKenna, a detective with the Chicago police department, testified for the State. Shirley "Red" Newsom testified for the defense.

Knowledge Williams testified that in the early morning hours of March 11, 1985, he left his home with "Red" Newsom in his 1973 Oldsmobile. He testified that he had drunk one beer before leaving home. They drove to the Stone Liquor Store at the corner of Kostner and Madison Streets, where Newsom wanted to be dropped off. Williams stated he recognized several people who were standing outside the store, among them Taborn, who asked him to drive her home. Taborn carried a beer bottle when she got into the front passenger seat. Williams drove around the corner, turning onto Wilcox Street near a school.

Williams testified that at this point Taborn knocked the car out of gear, snatched the keys, told Williams "this is a stick-up" and demanded his money. When Williams refused to give her his money, Taborn jumped on him, again demanded money, and hit Williams with the beer bottle on the right side of his head above the eye at the temple, spilling beer on him in doing so. Williams testified that the driver's window was half open.

Defendant approached the car and said, "[Y]ou heard the lady, she wants your money." The victim then testified that his window was open. Defendant was carrying a baseball bat, and when Williams refused to surrender his money, defendant hit him above the eye with the bat while Taborn reached into Williams' pocket and took his money. Then defendant and Taborn pulled Williams from the car, and defendant hit him two or three times with the bat and he lost consciousness. He testified that the attack took place near the alley.

When he regained consciousness he went to a nearby house, rang "somebody's" doorbell, and asked them to call the police. Williams testified on cross-examination, however, that he was unconscious when the police arrived. Williams found that his car keys and approximately $260 were missing and that his car had been moved to a different location from the place of the attack. Williams was taken to the hospital where his injuries required 50 stitches across his forehead.

Williams testified that prior to the attack he had known both assailants and had known defendant for approximately a year, although he did not know him by name, and that he had known Taborn and her family for four or five years. He stated he did not know where either of them lived, but that sometime later he saw them on the street and notified the police. On cross-examination he denied telling the police that he could obtain information about his attackers from people in the neighborhood. He also denied telling the police that he did not know the identity of the woman assailant.

Williams testified that about seven weeks later, on May 2, he identified defendant and Taborn in separate police lineups. He then identified them both at trial in photographs of the lineups. Williams also identified his car in a police photograph which pictured the car parked close to the school. Williams subsequently retrieved his car from the police pound.

He also testified that he was diabetic and was not supposed to drink alcoholic beverages. He testified that he had glasses on that night and that Taborn knocked them off when she jumped on him, that since the attack he has started losing his eyesight and that his "eyes are bad now."

On cross-examination, he testified that when he was first hit with the bat through the window of the car, the window glass was more than halfway down and was not broken when he was hit. Williams testified that he first saw the bat when defendant and Taborn dragged him out of the car. He testified that later the police called him to tell him the car had been towed to the pound. He stated that

he did not see the car when it was parked near the school as shown in the police photograph. He stated that he learned that defendant and Taborn lived on Kostner and when he saw Taborn on the street he called the police. He stated he did not ask her for his money back.

Williams testified that he told the police Taborn's name when he was at the hospital. He believed he told the police then that she had a beer bottle, that she poured beer over him, that she grabbed the gear shift and pushed the car out of gear, that she pulled the keys out of the ignition, that she grabbed him around the neck and went through his pockets and that he knew his attackers. He acknowledged that earlier on the day of their arrest he told the police that he had information that defendant and Taborn might be at 4342 West Washington.

Police detective McKenna testified that on May 2, at approximately 9:30 p.m., he conducted two lineups. He identified Taborn and defendant, who were present in court, as the persons in the lineups who were identified by Williams as his attackers. Williams testified that although he had seen Newsom since this incident, he did not mention it to her.

Shirley Newsom testified for the defense. She stated that she had known Williams, Rhonda Taborn and the defendant from around the neighborhood for a couple of years. She testified that on March 11, in the early morning hours, she and Williams were at his house, then left together to go to George's Lounge, where they remained for 15 to 20 minutes. She testified that while at the lounge Williams had two or three drinks in 15 minutes, that she did not see him pay for his drinks while they were there, that when they left they went to the car, both got in, and while they sat there Taborn came over and got in the car, that all three sat in the front seat with Newsom in the middle. They then rode off, turned onto another street, where they parked and talked for about half an hour. While they sat there defendant pulled up in his car and parked in the school lot. He got out of the car and called Taborn to come over to him, which she did. Newsom testified that she and Williams then got out of the car, and Williams went over to defendant and Taborn, about 15 to 20 feet away.

When Williams got out of the car she saw no injuries or bleeding about his face, but she noticed that he staggered a little bit, his eyes were a little red, and his speech was "a little sloppy." She earlier had asked him if he had money and he said he didn't. She saw none. She stated she felt his two front pockets to see if he was telling the truth and testified that this occurred when they left his house and before Taborn got in the car.

After Taborn and Williams got out of the car and went over to

the defendant, Newsom then started to walk away from them heading toward her home. As she was walking she continued to turn and look back at the group. She saw Williams fall forward to the ground as defendant and Taborn walked away. She continued to walk toward the corner and continued to look back. When she got to the corner, which was far away, she saw Williams and he was up on his feet and appeared to be staggering. She stated she did not see a bat or a weapon in anyone's hands at any time. She did not go back to help Williams because she thought he was drunk and because she was late getting home.

On cross-examination she acknowledged that she knew defendant and Taborn (whom she knew as Rhonda Fleming) from the neighborhood for about six months before this incident. She stated that she and the victim were friends. She saw no bottle in Taborn's hands when she got in the car nor did she see Taborn strike Williams. She stated that when they were parked, Williams parked on the school side of the street at the curb, and that this was a one-way street. She testified she had seen Williams four or five times since this incident, but that he never told her about this case or asked her to be a witness. She testified that she did not know whether Williams was unconscious when he fell but that she saw him get up and walk after the fall.

Certain stipulated testimony was read into the record. Police officer Jay Nielsen would testify that he interviewed Williams in the hospital on March 11 and that Williams told him that he had been stopped by an unknown woman who jumped out in front of his car and screamed for help and when he stopped he was hit in the head by unknown assailants; and that when he woke up in the hospital his money, car keys and ID were gone and he could not say more because of his injuries.

Detective Riemer would testify that he contacted Williams by phone two days after the assault and that Williams related a story to him similar to his trial testimony except that he said he was pulled from the car by the male assailant and then struck with a baseball bat, that his money, keys and car were taken and that he could identify his assailants. Riemer would further testify that Williams did not tell him that Taborn hit him with a bottle or that she had any sort of bottle with her.

Officer Dorich would testify that on April 17, he interviewed Williams, who told him that he might be able to obtain further information about the assailants from confidential sources on the street and would contact the police when he had information for them.

Dr. Mehta would testify that he is a physician and was employed at Mt. Sinai Hospital on March 11. D. McBride would testify that she is a registered nurse and was employed at Mt. Sinai Hospital on March 11. They both were on duty in the emergency room when Williams was treated. They observed a strong smell of alcohol on Williams.

There was a further stipulation that the items taken from Williams were a 1973 Oldsmobile, car keys, and $260.

The trial judge found Taborn not guilty of all charges. He found defendant not guilty of armed robbery but found him guilty of aggravated battery. Count III was merged into count II, and defendant was sentenced to two years' incarceration with credit given for time served. Defendant's post-trial motion was denied.

Defendant argues on appeal that he was not proven guilty of aggravated battery beyond a reasonable doubt and that his conviction for that offense must be reversed, because although the State presented identical evidence against him and his codefendant, the trial judge found defendant guilty of two counts of aggravated battery and acquitted Taborn of the same offense.

Initially we consider whether inconsistent verdicts for the defendant and Taborn based on the same evidence in a joint but severed trial raise a reasonable doubt as to the guilt of the convicted defendant. The defendant argues that the court erred in convicting him of two counts of aggravated battery while acquitting Taborn of the same offenses based on the same evidence offered by the State against them. He cites *People v. Carter* (1974), 19 Ill. App. 3d 21, 23, 311 N.E.2d 213, 215, as support for the proposition that where codefendants are tried on the same facts, the verdicts should be consistent and in such circumstances inconsistent verdicts raise a reasonable doubt as to the guilt of the convicted defendant. He also cites *People v. Gonzales* (1978), 67 Ill. App. 3d 215, 219, 384 N.E.2d 788, 792, wherein the court stated if there is no plausible construction of the evidence which would establish a reasonable basis for finding one defendant guilty and the other defendant not guilty, the conviction must be reversed.

■ However, unless the evidence against both defendants is identical, the failure to convict one codefendant does not necessarily raise a reasonable doubt as to the guilt of the other codefendant. (*People v. Vriner* (1978), 74 Ill. 2d 329, 343, 385 N.E.2d 671, 677; *People v. Stock* (1974), 56 Ill. 2d 461, 465, 509 N.E.2d 19, 21.) The slightest difference in the evidence can be sufficient to support different verdicts. *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 584-85, 444 N.E.2d

662, 669; *People v. Gonzales*, 67 Ill. App. 3d at 219; *People v. Beasley* (1976), 41 Ill. App. 3d 550, 554, 353 N.E.2d 699, 703; *People v. Taylor* (1974), 25 Ill. App. 3d 396, 403, 323 N.E.2d 388, 393.

■ Here the evidence against defendant and Taborn was not identical. The victim testified that as he was driving Taborn home she knocked the gear shift and took the keys from the ignition, that she hit him with a beer bottle and poured beer over him and that she demanded money from him, whereas the victim testified that the defendant hit him with a baseball bat through the window of the car, that defendant and Taborn pulled him from the car and that defendant hit him twice more with the bat.

However, defense witness Newsom testified that she was sitting in the front car seat between the victim and Taborn when they pulled over to the curb to talk while sitting in the car. She testified that while they were talking, defendant drove up in his car, parked and called Taborn to join him, and that first Taborn and then the victim got out of the car and walked over to defendant. Clearly the evidence was different as to Taborn and as to the defendant. The fact that a codefendant, whose role was different from that of her armed codefendant, was acquitted during a joint trial did not bar the codefendant's conviction on the same charges. *People v. Stock*, 56 Ill. 2d at 463.

Next, defendant argues that the evidence against him cannot support his convictions for aggravated battery. The victim testified that the defendant struck him in the head with a baseball bat, once while he was seated in the car and twice after he was pulled from the car, injuring him so that he required 50 stitches in the forehead. However, Newsom testified that at no time did she see a baseball bat or any other weapon in defendant's hands. She testified that she was seated in the center of the front seat of the car between the victim and Taborn, that after Taborn got out the victim got out and walked 15 to 20 feet to where defendant was standing, while Newsom then got out and walked in a different direction toward her home. She stated that when she looked back the defendant, Taborn and the victim were standing together and engaged in a conversation with the victim, who was standing next to defendant, and when she looked back again the victim was getting up from having fallen to the ground as the defendant and Taborn were walking away. Newsom believed the defendant was drunk since he had staggered as he got out of the car and that his eyes were red and his speech "a little sloppy."

The trial judge commented that he thought "that both defendants and the one other witness that testified are all less than desirable."

However, we note that neither defendant nor Taborn testified at trial and for that reason we cannot conclude that the court's comment "less than desirable" was meant to imply that they were not credible. Aside from stipulated testimony, the court heard only testimony from the victim, police officer McKenna, and Shirley Newsom.

The trial judge commented that the victim told "a pretty consistent story in some respects" but that he "was having a bit of a problem remembering all the facts because of the injuries, perhaps because he was drinking \*\*\* perhaps because of his [diabetic] condition he can't handle it [alcohol] too well." The judge commented that the victim's testimony placed Taborn in the car and at one point placed Newsom in the car.

He commented that there was a lot of confusing testimony but that Newsom's testimony which placed everybody on the scene at the same time and the victim next to defendant when he fell straightened it out pretty well. The judge found "interesting" the fact that Newsom testified that the victim was "basically staggering drunk" yet both she and Taborn got into the car with him to drive around, and later by "sheer coincidence" the defendant drove right to the place where they were parked. The court commented that Newsom testified defendant called Taborn over, that the victim also walked over to the place where Taborn and defendant stood, that as Newsom walked away she turned and saw the victim fall or saw him on the ground after he fell, and that he was with the defendant at the time. The court then acquitted Taborn of all charges, acquitted defendant of armed robbery, but found defendant guilty of aggravated battery.

Defendant contends that he was not proven guilty beyond a reasonable doubt and that the State's evidence against him alone cannot support a conviction for aggravated battery.

■ In *People v. Young* (1989), 128 Ill. 2d 1, 48, 538 N.E.2d 461, the Illinois Supreme Court held that "[t]he due process clause of the fourteenth amendment (U.S. Const., amend. XIV) protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged. [Citation.] When presented with a challenge to the sufficiency of the evidence, it is [the reviewing] court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury saw and heard the witnesses. If, after such consideration, [the reviewing] court is of the opinion that the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged, then the conviction must be reversed."

The court in *Johnson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed.2d 560, 573, 99 S. Ct. 2781, 2789, held that "the relevant question [on review] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)

Our court has held that a conviction will not be disturbed unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable, unsatisfactory or inconclusive that defendant could not have been found guilty beyond a reasonable doubt. (*People v. Jarvis* (1987), 158 Ill. App. 3d 415, 425, 511 N.E.2d 813, 819.) However, while we attach great weight to the findings of the trial judge, including witness credibility, his findings are not conclusive, and the reviewing court has the duty to set aside a conviction where the evidence is such that it leaves a reasonable doubt as to the defendant's guilt. *People v. McKibben* (1974), 24 Ill. App. 3d 692, 697-98, 321 N.E.2d 362, 366.

The victim testified at trial that while he and Taborn were sitting in the parked car, defendant came up to the car where he, the victim, was seated in the driver's seat, that defendant struck him once through the partially open window with a baseball bat, that defendant and Taborn dragged him from the car and that defendant again struck him in the head with the bat twice, severely injuring him and causing him to lose consciousness. He testified he required 50 stitches to close his wounds and now has trouble with his memory and his eyesight.

In contrast, however, Newsom testified that she was seated in the front seat of the car between the victim and Taborn, that when defendant parked nearby, both Taborn and the victim exited the car and walked over to defendant, that she, Newsom, then began walking home, and while looking back at the group from time to time, she saw the victim fall and then saw defendant and Taborn walking away. Newsom testified that she saw no baseball bat or weapon in defendant's hands at any time. She also testified that the victim had consumed two or three drinks in the bar in about 15 minutes time just prior to this incident and that he staggered, his speech was a little "sloppy" and she believed him to be drunk.

■ Suspicious conduct or probabilities cannot substitute for proof, and the mere presence of defendant at the scene of the crime is not of itself sufficient to sustain a conviction. (*In re Whittenburg* (1976), 37 Ill. App. 3d 793, 795-96, 347 N.E.2d 103, 105; *People v. Mitchell* (1978), 59 Ill. App. 3d 367, 369, 375 N.E.2d 531, 533.) The

evidence which supports a conviction must produce a reasonable and moral certainty that the defendant committed the crime. *Mitchell*, 59 Ill. App. 3d at 369.

The State offered the testimony of the victim, who testified defendant struck him three times with a baseball bat, causing him to fall and become unconscious, and that when he recovered his senses he went to call the police, yet on cross-examination, he stated he was unconscious when the police arrived at the scene. He testified that he knew who his assailant was and knew Taborn. But the stipulated testimony of Officer Nielsen of the victim's statement to him in the hospital was that an unknown woman jumped in front of his car and when he stopped to help her he was struck by unknown assailants. Detective Riemer's stipulated testimony of the victim's statement was that defendant struck him with the bat after pulling him from the car but that he did not tell the officer that Taborn had struck him or that she had a bottle with her. While the victim testified he knew who his assailant was, Officer Dorich's stipulated testimony was that he did not identify the defendant early in the investigation but instead told the police he would try to get information from confidential sources on the street.

◼ The inconsistencies in the victim's various versions of the occurrence when viewed together with Newsom's testimony that she saw no baseball bat in defendant's hand at any time, that the victim appeared to be drunk and staggering as he got out of the car and walked over to defendant and that he was getting up as defendant and Taborn walked away, create a reasonable doubt as to the credibility of the victim's testimony.

We also note that the victim's statement at trial that defendant struck the first blow to his head with the bat through the partially opened car window raises a credibility question when we consider the logistics of striking such a blow when the open space access to the victim-target was so limited.

While the trial judge found that the victim's statements were contradictory, he concluded that this could have been the result of his severe injuries or his drinking and that he told "a pretty consistent story in some respects." The court found that there was a lot of confusing testimony but that Newsom placed the victim, the defendant and Taborn on the scene at the same time and placed the defendant next to the victim when he fell. On this basis the court found Taborn not guilty but found defendant guilty of aggravated battery.

Newsom saw no weapon, and saw no attack on the victim. The victim did not identify the defendant as his assailant immediately fol-

lowing the incident of March 11, stating instead that he was struck by an unknown assailant. However, on March 13, the victim knew the identity of his assailant, and on April 17, offered to obtain more information about him on the street and still later on May 2, identified defendant in a police lineup.

■■ While commenting that there was "a lot of confusing testimony" the court nevertheless found defendant guilty of aggravated battery. We find that the evidence was not so overwhelming or convincing as to defendant's guilt. Even when viewing the evidence in the light most favorable to the prosecution, we find the State has failed to prove beyond a reasonable doubt that the defendant committed the crime. We therefore reverse the defendant's conviction for aggravated battery.

Judgment reversed.

McNAMARA and EGAN, JJ., concur.