THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LAWRENCE DRAPER, Defendant-Appellant.

First District (2nd Division)    No. 78-1306

Opinion filed December 26, 1979.

Julius Lucius Echeles and George M. Zuganelis, both of Chicago, and Paul
David Kelley, legal researcher, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Eisen-
Stein, and Mark S. Komessar, Assistant State's Attorneys, of counsel), for the
People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

On October 3, 1975, at about 2 a.m., Donald Gilmore, a security
guard, was shot and killed in front of the nightclub by which he was
employed on East 79th Street in Chicago. Defendant Lawrence Draper, a
club patron, was charged with and convicted of his murder in a bench
trial and sentenced to serve from 14 to 20 years in the penitentiary. He
appeals on the grounds that his guilt was not proven beyond a reasonable
doubt and that consideration of lesser offenses was refused by the trial
court. We affirm for the reasons which follow.

Four witnesses testified for the State. The first was Sandy Gilmore,

the victim's wife, who provided the life-death information as to decedent. The next witness was Robert Ware, who testified that on October 3, 1975, he was manager of the nightclub, Purv's House, 914 E. 79th St., a two-level entertainment complex with a lounge and discotheque on the first level, and a showroom on the second level. At about 2 a.m. he was helping to clear the halls on the first floor, standing at and holding open the center door to enable people to leave the building following an altercation between two women. There was a lot of commotion at the doorway. He saw defendant and decedent struggling outside over a gun. He turned to get help when he saw a flash come from the gun, then held by defendant, who was pointing it down at decedent, now lying on the ground a foot or two away. On cross-examination, Ware testified that he was standing inside the building while holding the center exit door open. He did not see defendant or decedent struggling inside or go through the door. He did not remember how long he was standing at the door before he saw them struggling outside. After he turned to seek help, he heard two shots, at which time he turned and saw the flash coming from the gun. He didn't remember if decedent was face up, face down, or on his side at the time of the shooting. Twenty to forty people were in the hallway with him and four or five fights were going on simultaneously.

Anthony Mathews testified for the State that on October 3, 1975, at about 1:30 a.m., he was employed and on duty as a security guard at Purv's House in the second floor showroom. Although not part of the entertainment, defendant went on stage while a fashion show was in progress. Another club employee twice asked him to leave, which he refused to do. An altercation developed between defendant and the employee, which Mathews attempted to stop. When Mathews was about to telephone for more security personnel, defendant descended from the stage and ran toward the stairs. Mathews followed him. Two guards, John Crenshaw and decedent, who was wearing a blue uniform, were coming up the stairs at this time and all three pursued defendant out of the building and down 79th Street where Crenshaw and decedent apprehended him. After one of them told defendant he could reenter Purv's House if he remained "cool," he did so, as did the two guards.

Mathews went upstairs and tried to stop two women fighting at the top. Their male companion intervened and when decedent rushed upstairs to assist, the man swung at him. Decedent took his revolver from his holster and told him he would take them out of the club. As the decedent was escorting this group downstairs, defendant, who was on the stairs, grabbed decedent's revolver and ran with it. Decedent pursued him, grasped him around the waist, and was dragged to the exit where the door swung open as they hit it. Mathews followed them out the door where he observed the two still struggling. Defendant shot the gun off

once in the air and then once behind him. As they continued to struggle, decedent tripped and fell face down onto the ground. Defendant turned from left to right and fired two shots down into decedent. Defendant then ran away still holding the gun. On cross-examination, Mathews testified that he didn't see Robert Ware standing at the center doorway as he went through it, but did see him standing in the doorway when he turned back towards the club after the shooting.

Two stipulations by the parties were read into the record during the State's case-in-chief, one concerning the coroner's report, the other concerning the arresting officer's report. The coroner would testify that on October 3, 1975, an autopsy performed on Donald Gilmore revealed two bullet wounds. One bullet entered the right side of his chest with an overall directional course from right to left, lacerating both lungs, which caused his death. The other bullet entered the right upper hip, adjacent to the buttocks region, four centimeters below the small of the back, and penetrated upwards to his aorta.

The arresting officer, Investigator McGuire, would testify that on October 3, 1975, after preliminary investigation he and his partner went to 6757 South Loomis where they arrested defendant and advised him of his *Miranda* rights. On the way to the police station defendant stated that he had thrown the gun on top of a garage roof, which they then searched for but were unable to find. After defendant was booked, he was placed in a five-man lineup and was identified by Ware and Mathews, viewing the lineup separately, as the person who did the shooting.

The State then rested. The defense moved for a directed verdict at this point, which the trial court denied.

Phillip Weaver, called by defendant, testified that as he and defendant were going upstairs at Purv's House, he saw some guards breaking up a fight at the top of the stairs between two women. A boyfriend of one of the girls intervened and started fighting the guards, who, in turn, began hitting him while bringing him down the stairs. Defendant asked a guard why he was beating the man that way and Weaver then heard several guards say, "[o]ne of the dudes is talking to the guard. Let's get him," referring to defendant. The guards ran downstairs after defendant and then a uniformed guard, with his gun drawn, jumped on his back. Weaver did not see defendant take the gun away from the guard. Defendant and the guard continued to fight out through the door. He did not see what occurred thereafter. On cross-examination, Weaver testified that he and defendant went upstairs to the fashion show and onto the stage, although they were not part of the show. A guard asked defendant to leave the stage, and arms began to swing, but there was no contact. Several people pulled defendant and the guard apart and the guards escorted them outside. They were then allowed to reenter Purv's

House. After defendant began struggling with a uniformed guard, Weaver did not see a gun but did hear a gunshot while the two were still inside. He did not see any more of the occurrence because he hid inside the club after hearing the shot.

Defendant testified on his own behalf that after he entered Purv's House for the second time on October 3, he headed for the stairs. When he was about half-way up he saw two women fighting and two men trying to break it up. He turned around and started down the stairs, and heard someone say, "let's get him." He began to run and brushed past a security guard. He looked over his shoulder and saw this guard chasing him with a gun in his hand. Before he reached the door, he turned, grabbed the hand of the guard holding the gun, and the guard then grabbed him around the waist. They struggled and went through the door to the outside. The gun was in the guard's hand pointing upward when it went off the first time. As they continued to struggle, the gun, still in the guard's hand, went off a second time, hitting the guard in the side. He grabbed the gun from the guard, who then grabbed his wrist and the gun went off a third time. The guard was still standing when he ran away. He did not intend to shoot the guard, who was not on the ground when he was shot.

Both the State and defendant advised the trial court that Antonio Davis, an eyewitness who had testified at the preliminary hearing, was now unavailable. The defense requested that Davis be considered the court's witness and that his testimony from that hearing be received in evidence, which the trial court allowed. The transcript of his testimony revealed that he was a patron at Purv's House and saw defendant involved in a fight on stage. He saw defendant leave and then reenter, "snatch" a gun out of a guard's holster and run with it. The guard chased defendant, jumped on his back, struggled with him inside, and continued to struggle as they went outside. While both were still standing, the gun went off once. As they continued their struggle, the guard fell backwards onto the ground. Defendant was trying to get away, but the guard's legs were hanging onto him. As defendant was turning, the gun in his hand was pointed at the guard lying on the ground and fired once or twice. Defendant was looking at the guard as the gun was fired, and was standing over the latter at that time. On cross-examination, he testified that the gun went off as defendant was pulling away from the guard. The guard was lying face up when the gun was fired.

Charles Eady testified for the State on rebuttal that he was now a police officer but was a private citizen on October 3, 1975. At approximately 2 a.m., he drove his automobile to the front of Purv's House and saw two men struggling as they came out the front door, one wearing dark clothing and the other a tan jacket, later identified in court as defendant. When the dark-clothed man fell to the ground, defendant

pointed a gun down at him and fired two shots. He demonstrated the position of the two men at the time of the shooting which the prosecutor described for the record: "* * * Officer Eady who is representing the person in the dark clothing is lying on his left side with his right side in an upward position resting himself on his left elbow with his right arm in a 45° angle position, * * * his left leg is opened so that he would be on a 45° angle." The court then said "[r]ight leg in front of his left leg," and the prosecutor said "all right." Eady then assumed the position of defendant and the prosecutor assumed the position of the person in the dark clothing. At the prosecutor's request, the trial judge described Eady's new position for the record, "I see the witness standing with his left foot direct[ly] in front of the left leg between the ankle and the knee of the person on the floor, and he has his right hand outward pointing down towards the person on the ground."

Both sides rested and the court and counsel engaged in the following colloquy:

"THE COURT: I would just like to say this before I recess for deliberation. If I were instructing the court as trier of the facts the same as I would the jury, and as part of the instructions you have a voluntary manslaughter instruction and involuntary manslaughter instruction, perhaps the court might consider. I just say that because if I were instructing the jury, those instructions, I think, might have to go to the jury. The one as to voluntary, since there was some evidence pertaining to flight, and involuntary since there was some evidence as to perhaps recklessness in the conduct, in the manner of maybe having the gun and using it, if the court finds that. If you want to make any statements with regard to it, you may, either side.

MR. ECHLES: We are not asking for a manslaughter consideration, Judge. The witnesses testified as the witnesses testified.

MR. ELDEN: I respectfully submit it is a murder because that action of his, when the man is down on the ground, is not recklessness. It is intentional of him. After the flight, involuntary manslaughter, there was no provocation on the part of the deceased. The defendant started it by taking the gun."

Defendant argues that the evidence is insufficient to support the guilty finding based primarily upon what he characterizes as major inconsistencies in the testimony of Robert Ware, Anthony Mathews and Charles Eady; also that their testimony is contrary to the pathology report. First, defendant contends that the testimony of Ware and Mathews was inconsistent because Ware claimed to have witnessed the shooting from the doorway, yet Mathews stated that Ware was not in the

doorway at that time. As the State contends, however, the two versions are consistent. Mathews witnessed all four shots, the first two as he stood at the doorway and the latter two when he went outside. Ware arrived at the doorway after the struggle between defendant and decedent had moved outside and the first two shots had already been fired. Ware witnessed only the last two shots, after Mathews had already gone through the doorway. Defendant's thesis is thus without evidentiary support.

■■■ Defendant next urges that the eyewitness testimony describing the shooting was inconsistent because Ware testified that decedent was on the ground when shot, whereas Mathews stated that decedent was holding defendant around the waist when shot and then fell down, and Eady related that the victim fell to the ground and was shot twice by defendant as he lay there. The record shows, however, all three testified that defendant shot decedent while he was lying on the ground. The testimony of Davis given in the preliminary hearing, the transcript of which defendant successfully sought to have admitted in evidence, also places decedent's body on the ground at the time he was shot once or twice by defendant. Ware could not remember the position decedent was in at the time of the shooting; Mathews testified that decedent fell face down on the ground and was then shot; Eady testified that decedent was on his left side with his right leg raised in the air when he was shot; and Davis had him on his back at that time. The only inconsistency in the testimony is the precise position of decedent's struggling body as he was seen from the point of vision of each witness as he was being shot, which is of a minor character when compared to the uncorroborated defendant's version of the facts: that he and decedent were both standing when the fatal shots went off accidentally. Minor discrepancies in the evidence are an insufficient basis upon which to set aside a finding of guilt where, as in this case, that finding is supported by the totality of the evidence beyond a reasonable doubt. (*People v. Clark* (1977), 47 Ill. App. 3d 624, 632, 365 N.E.2d 20.) In *People v. Powell* (1978), 72 Ill. 2d 50, 377 N.E.2d 803, *cert. denied* (1979), 440 U.S. 907, 59 L. Ed. 2d 455, 99 S. Ct. 1214, the supreme court had before it an appeal from a bench trial. The defendant there had been convicted of bribery and solicitation. Among the arguments made was that a police officer, upon whose testimony the conviction rested in part, was an allegedly admitted perjurer and there were variances in his testimony. In upholding the decision of the trial court, the supreme court stated (72 Ill. 2d 50, 65):

> "[T]he fact remains that the discrepancies in the officer's testimony are not significant, and neither his control of the recording switch nor the alleged perjury diminishes or explains away the incriminating character of defendant's recorded conversation.

> '[W]here a case is tried by the court without a jury, the determination of the credibility of the witnesses and the weight to be accorded their testimony is committed to the trial judge; and, unless it can be said that the court's judgment is found to rest on doubtful, improbable or unsatisfactory evidence, or clearly insufficient evidence, a reviewing court will not substitute its judgment for that of the court below even though evidence regarding material facts is conflicting and irreconcilable. (*People v. West*, 15 Ill. 2d 171.)' *People v. Clemons* (1962), 26 Ill. [2d] 481, 484."

No basis for reversal exists in the instant record notwithstanding the inconsistencies.

The defense maintains that the testimony of the eyewitnesses contradicts the medical report of the coroner, in that the witnesses testified that the gun was pointed in a downward position yet the coroner indicated that the hip wound was probed upwards. The testimony of Mathews, Ware, Eady and Davis disclosed that decedent was on the ground and that defendant stood over him when the shots were fired. Eady's and Davis' testimony described defendant as standing near decedent's feet with his head furthest away, the testimony of Eady specifically asserting that decedent was lying on his left side with his right leg elevated toward the defendant, and the testimony of Davis particularly denoting that decedent's legs were pointing towards the defendant and may have been wrapped around him. The coroner's report revealed that the bullet in question entered the victim's right hip and penetrated his body up to his aorta. As the State correctly contends, the eyewitness testimony and the coroner's report are consistent because, given the relative positions of defendant and decedent, a bullet fired down at the latter which entered his hip in a directional line from feet to head would penetrate upward into his body.

The defense cites *People v. Kilgore* (1974), 59 Ill. 2d 173, 319 N.E.2d 489; *People v. Ephraim* (1971), 133 Ill. App. 2d 310, 273 N.E.2d 225; *People v. Smith* (1971), 3 Ill. App. 3d 64, 278 N.E.2d 551; *People v. Price* (1974), 21 Ill. App. 3d 665, 316 N.E.2d 289; and *People v. Richardson* (1974), 21 Ill. App. 3d 859, 316 N.E.2d 37, to support his theory that the alleged contradictions in the testimony at bar preclude the finding of guilt beyond a reasonable doubt. In *Kilgore*, three entirely different descriptions of the perpetrator of the murder there involved were given, each contradicting the other as to height, build, race and clothing, which was found to be unsatisfactory as support for conviction. In *Ephraim*, the identification of defendant there was weakened by the self-contradictory nature of the witnesses' testimony which also contradicted each other, the

abandonment of earlier testimony and the poor opportunities of the witnesses to view the putative defendant, all leading to reversal. The severely undermined credibility of the sole prosecution witness in *Smith*, caused by self-contradiction, varying versions and lack of positive identification of defendants as to the assailants in that case resulted in reversal of conviction in that case. The inconsistencies and improbabilities in the uncorroborated accomplice witness' testimony given in return for promised leniency was the cause for reversal in *Price*. In *Richardson*, a reckless homicide case, the arresting officer's testimony was contradicted by his own report and lack of investigation, which cast serious and well-founded doubt as to defendant's guilt and caused reversal without remand. Reliance by the defense upon these cases as authorities for disregarding the essentially clear and convincing evidence of defendant's guilt in the case at bar is considerably wide of the mark and unpersuasive.

■ Defendant also incorrectly asserts that Mathews was the only witness to testify that defendant took the gun away from decedent in the hall; the testimony of Davis also indicated that this occurred. Defendant claims that he was not shown to have any motive for killing decedent. If the evidence establishes beyond a reasonable doubt that the defendant killed the victim, however, the question of motive is immaterial; it is not an essential element of the crime of murder. Ill. Rev. Stat. 1977, ch. 38, par. 9—1; *People v. Mangano* (1940), 375 Ill. 72, 76, 30 N.E.2d 428; *People v. Richards* (1976), 40 Ill. App. 3d 717, 721, 353 N.E.2d 74.

■ Defendant contends that the gun went off accidentally and the shooting occurred during an act of self-defense, even though he shot decedent twice as he lay on the ground, relying principally upon *People v. Shipp* (1977), 52 Ill. App. 3d 470, 367 N.E.2d 966. The facts in *Shipp* are of such a bizarre nature and so inapposite to those obtaining in the present case as to be of little, if any, precedential effect. Defendant in the present case, who was 5'11" tall and weighed 210 pounds, after taking the weapon away from decedent, was seeking to escape from an unarmed man, who was 5'8" tall and weighed 135 pounds, and was lying on the ground, and who then posed no threat to defendant's life or limb. Under these facts, the trial court could justifiably find the self-defense theory without merit.

As his last argument, defendant insists that the trial court improperly refused to consider lesser offenses of voluntary and involuntary manslaughter, addressing the comment made by the court after closing arguments by both parties. As noted at greater length earlier in this opinion, the court essentially said, "[i]f I were instructing the court as trier of the facts the same as I would the jury * * * [a] voluntary manslaughter instruction and [an] involuntary manslaughter instruction * * * might have to go to the jury." Both parties then objected to any

consideration of such lesser included offenses. After a short recess, the trial court found defendant guilty of murder, asserting that he believed from the evidence that defendant intentionally shot decedent. At a hearing later on defendant's motion for a new trial, defendant argued that the trial court improperly refused to consider lesser offenses, to which the court responded, "I made that statement so that you would know that the court was aware of at least lesser included offenses that would be given to the trier of fact, if it were a jury * * *. I brought these two points up so that you would not say that the court was completely unaware of the lesser included offenses." Defendant's claim that the trial court refused to consider lesser included offenses is thus without substance. Furthermore, the trial court specifically stated that it believed the eyewitness testimony that defendant intentionally shot decedent and that this constituted murder.

For the reasons assigned above, we must conclude that the record supports the trial court's finding that defendant was guilty of murder beyond a reasonable doubt and that the trial court did consider lesser offenses in arriving at its conclusion. We must therefore affirm.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.