THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARK SCHEIDT, Defendant-Appellant.

Third District   No. 82—67

Opinion filed March 22, 1983.

Robert Agostinelli and Frank W. Ralph, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Patricia Hartmann, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

The defendant, Mark Scheidt, was convicted of the murder of Gary L. Shimerda following a jury trial in the circuit court of Will County. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1).) He was sentenced to a term of 28 years of imprisonment.

During the trial, State witness Debbie Brown testified that on August 2, 1980, at about 10 p.m., she went to the Welcome Inn Tavern with Geri Hooper. The defendant, Gary Shimerda, and Gordon Weitting were also at the Welcome Inn. While in the tavern, the defendant told Brown, Weitting, and another person that he wanted to kill Shimerda because Shimerda knew too much about a burglary. Later, the defendant repeated his threat to kill Shimerda.

The tavern closed at about 2:45 a.m. on August 3, 1980, but the patrons stayed outside for a short time. Then Brown, Weitting, and Shimerda left with the defendant in his car. Brown said she accepted the defendant's offer of a ride home earlier that night when Geri

Hooper had to leave. After leaving the tavern, they went back within a few minutes and Weitting took the telephone number of one of the girls standing outside the bar. The four then decided to go to Catfish Days, a festival held in Wilmington, Illinois. On the way to Wilmington, the defendant, who was seated next to Brown, told her he wanted to kill Shimerda, who was riding in the back seat. Weitting was driving.

When they arrived in Wilmington, they learned that Catfish Days was over. They decided to go to a large swimming lake instead, which was called the "ropes." On route to the "ropes," the defendant told Weitting to stop the car. The defendant and Weitting walked around for a couple of minutes and then returned to the car. They stopped again at the "ropes" parking lot and all but Shimerda used the restroom facilities. When they got back in the car, Brown drove.

Brown testified that the defendant ordered her to pull off the road, and she complied. As the defendant stepped out of the car, Weitting told her to get out and pushed her. Weitting and Brown went across the road, approximately 25 feet away from the car. The defendant had taken out the shotgun he had placed between the seat and the front passenger door earlier that night. The defendant walked around the car and opened Shimerda's door, ordering him out of the car. He told Shimerda he did not want to get the car messy. Shimerda would not get out of the car.

The witness said she heard Shimerda say something which sounded like, "I don't deserve it." The defendant ordered him out of the car again. Brown said there was a brief silence and then she heard a shot. The defendant asked Weitting to help him carry Shimerda out of the car and put him in a nearby ditch. At first Weitting refused, but he agreed after a second request from the defendant. Brown said she turned around and saw the defendant and Weitting drag Shimerda from the car and into the ditch. The three then left the area.

On the way toward Joliet, Brown testified that the defendant appeared happy and proud. He kept saying, "Such a man, I'm real cool now." The defendant told Weitting to tell everyone in the "Bud gang," a group of people in Green Tree who drank Budweiser beer, that he was "real cool," but not to tell them what he did.

The defendant removed the shell from the shotgun and threw it out the car window. Before arriving in the area where Brown lived, the defendant told Weitting that he trusted him but he did not know about trusting Brown. The defendant reminded Brown and Weitting not to tell anyone, and then he told Weitting that if he needed any-

body taken care of, he should tell the defendant. The defendant explained that he had done it before and could do it again.

Brown testified that she and a friend went back to the ditch later that day to see if Shimerda's body was still there. After seeing it, they went to the Wilmington police department and reported the shooting. Then she took the police to the body.

During cross-examination by the defense counsel, Brown admitted lying to Lynn Jencons, an investigator with the Will County sheriff's police. Brown told Jencons on August 3, 1980, that the defendant dragged Shimerda's body to the ditch by himself. She had told Jencons that the defendant showed his gun to everyone in the tavern, while her trial testimony contradicted this prior statement. No other witnesses at the tavern recalled seeing the gun. Brown had also failed to tell Jencons that the defendant wore a red bandanna.

The defense counsel questioned Brown about the burglary she referred to on direct examination. She stated that the burglary was at the Welcome Inn Tavern. It was common knowledge that the defendant or his brothers burglarized the tavern prior to August 2, 1980. Brown believed that this burglary must have been the one to which the defendant referred. Finally, she admitted giving conflicting statements concerning the position of herself and Weitting at the time of the shooting.

The State also introduced the testimony of other witnesses concerning the location and condition of Shimerda's body. A search of the defendant's car on August 5, 1980, revealed stains and blood in the back seat, as well as a stained T-shirt. Expert testimony established that the blood type was not inconsistent with Shimerda's blood type.

The defendant presented his defense after his motions for a directed verdict and a mistrial were denied. Joe Lopez was the first defense witness. Lopez lived next door to the defendant, who lived with his brother, Richard Scheidt, Gary Shimerda and Richard Cunningham. At about 2 or 2:30 a.m. on August 3, 1980, Lopez said he saw someone get into the defendant's car but it was not the defendant. The person he saw drive off had shorter, darker hair than the defendant and did not wear a red bandanna. Michael Scheidt, the defendant's brother and Lopez' roommate, corroborated this testimony.

Timothy Scheidt, the defendant's brother, testified that he went to the defendant's house on August 3, 1980, at approximately 12 or 12:30 am. He saw the defendant sleeping on the couch. The defendant's car was not there.

Richard Scheidt testified that he returned to his house on the

morning of August 3, 1980. He saw the defendant passed out on the couch and noticed the back doors were open. Richard looked out and saw his uncle, Richard Cunningham, washing out the back seat of the defendant's car with a hose. He talked to Cunningham and when he left, the defendant was still passed out on the sofa.

The bartender at the Welcome Inn Tavern, Joseph Palacios, also testified for the defense. He said that Debbie Brown frequently tried to buy drinks for Gordon Weitting but he would refuse to accept them. Brown had told Palacios that she could not get over Weitting. Palacios also stated that Weitting was a regular patron of the tavern and often wore a red bandanna, one of his "trademarks."

The defendant sought to introduce testimony indicating that he was not involved in the burglary of the Welcome Inn to which Debbie Brown testified. The State filed a motion *in limine* to exclude any evidence concerning the burglary because it was irrelevant. After lengthy argument by the State and the defense, the court granted the State's motion *in limine* to exclude the evidence.

The defendant raises two issues on appeal. The second one is addressed first.

During *voir dire*, two panels of four jurors were accepted by both the State and the defense and were sworn. A third panel was accepted by the State and the defense but before they were sworn, the court asked each of the four if they had any reservations about serving with an unbiased mind. Wanda Nagel responded that it was a tremendous responsibility, and she did not like the idea that she had this responsibility. She did believe, however, that she could handle the responsibility, and, if chosen, would do so to the best of her ability.

Upon hearing this response from Ms. Nagel, the State moved for permission to reopen the final panel in order to exercise a peremptory challenge to Ms. Nagel. The State said there was an insufficient basis for a challenge for cause. The defendant objected to the State's motion, but it was allowed. The court said it would "reopen the last panel for pre-emptory [*sic*] cause and otherwise." Ms. Nagel was then excused. A defense motion for a mistrial in regards to this procedure was denied.

The defendant claims that the trial court erred in permitting the State to reopen an accepted panel of jurors in order to exercise a peremptory challenge toward one juror. He relied on *Mayers v. Smith* (1887), 121 Ill. 442, 13 N.E. 216, for the proposition that there is no right to a peremptory challenge to a juror after the juror has been accepted and the panel tendered but not sworn.

■■ ■ Once a juror has been accepted and sworn, neither party

has the right to challenge the juror. (*People v. Gamboa* (1975), 30 Ill. App. 3d 242, 332 N.E.2d 543.) Nor does a party have the right to peremptorily challenge a juror once he is accepted but not yet sworn. (*People v. Gray* (1911), 251 Ill. 431, 96 N.E. 268; *Mayers v. Smith* (1887), 121 Ill. 442, 13 N.E. 216.) However, the court in *Mayers* expressly stated that "We decide or intimate nothing in respect of a court's discretion as to the allowance of a peremptory challenge in such a case." *Mayers v. Smith* (1887), 121 Ill. 442, 449-50, 13 N.E. 216, 218.

The court stated in *People v. Joyce* (1910), 154 Ill. App. 13, 17:

> "*** the court was not required to permit a peremptory challenge of a juror after he had been accepted by both parties, though the court in the exercise of a sound discretion might have done so."

The court further stated that if the party seeking to challenge a juror after accepting him had shown the court that information had reached him for the first time which, if he had known, would have caused him to peremptorily challenge the juror, it would have been within the court's power to allow the party the peremptory challenge.

In the instant case, it was a matter within the court's discretion whether to allow the State to peremptorily challenge a juror it had previously accepted but who had not been sworn. While the State did not have a right to exercise a peremptory challenge nor a basis for challenge for cause, the court had the power to allow the State to exercise a remaining peremptory challenge. The court's discretion to grant such a challenge after acceptance extended to the defendant as well. Therefore, the trial court did not err in reopening the previously accepted panel to allow the State to exercise a peremptory challenge. Under the facts of this case, the trial court exercised its discretionary powers properly. In any event, the defendant has failed to establish any prejudice as a result of the reopening and peremptory challenge. *People v. Ward* (1965), 32 Ill. 2d 253, 204 N.E.2d 741.

The defendant contends in his other issue on appeal that the trial court committed reversible error by excluding certain defense evidence. He claims that he had evidence which rebutted the testimony of Debbie Brown, which attributed a motive to the defendant for the murder of Gary Shimerda. The defendant sought to introduce the evidence in order to disprove his commission of the burglary, thus rebutting a motive for murder, and to impeach Brown. The defendant asserts that by excluding this evidence the court denied him a fair trial and due process.

In reviewing the record, we note the simple statement made by

Debbie Brown during her testimony when asked by the State what, if anything, the defendant said to her prior to the shooting. Her reply was:

"Well, we were just talking about different things for a while, and then he brought up that he wanted to kill Gary Shimerda, because he knew too much about a burglary."

Her reference to a burglary was not presented as evidence of another crime but merely as part of the defendant's statement. The statement as a whole showed an intent on the defendant's part to kill Shimerda. It did not establish a previous crime committed by the defendant, since it was so vague.

It was the defense which brought out the incriminating details of the burglary mentioned by Brown. On cross-examination, the defense counsel inquired as to which burglary the defendant meant, and Brown implicated the defendant, or his brothers, in a July 31, 1980, burglary of the Welcome Inn. Until the defense brought this information forward, Brown's reference to a burglary did not present evidence of another crime by the defendant since the initial statement was nonspecific, and the State did not elicit any other details of the burglary.

■■ The statement by Brown on direct examination was not presented as evidence of motive by the State. The State did not argue motive, and it was not required to prove motive. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1; *People v. Draper* (1979), 79 Ill. App. 3d 749, 398 N.E.2d 1023.) The evidence that the defendant did not commit the July 31, 1980, burglary was properly excluded, because it was irrelevant and did not rebut evidence established by the State.

The excluded evidence that the defendant did not commit the burglary would not have impeached Debbie Brown. Her testimony merely repeated a statement made to her by the defendant concerning an intention to kill Shimerda. Whether the defendant actually committed the burglary does not affect the statement she claims he made. Nor would the evidence impeach her on what she heard about the burglary. Brown said she heard that the defendant or his brothers burglarized the Welcome Inn. The excluded evidence would not affect whether Brown heard this information, and, at any rate, the evidence would have tended to corroborate the information, *i.e.*, that the defendant's brother committed the burglary.

While a defendant may prove any fact or circumstance tending to show that the offense was committed by a person other than himself (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590), the excluded evidence in the instant case would not have exculpated the defendant

of the murder of Shimerda and linked Gordon Weitting to the murder. The evidence would have shown Weitting, as well as others, including the defendant, involved in the burglary. Any link between Weitting and the murder of Shimerda was nebulous in light of the eyewitness testimony against the defendant. The excluded evidence would have reinforced the fact that the defendant was indirectly involved in the July 31, 1980, burglary and that his brother actually committed the crime. Reviewing the excluded evidence, we believe the trial court was correct in its evaluation that it would have harmed the defendant. It cast as much guilt on the defendant as any other person involved in the burglary. Therefore, it was properly excluded.

Since the excluded evidence would more likely have harmed the defendant, the statements made by Brown during cross-examination were left before the jury without explanation. First, this information was brought out by the defendant. Second, any reference to the burglary was harmless error in view of the evidence against the defendant. There was eyewitness testimony that the defendant committed the murder, as well as physical evidence linking him to the offense. Therefore, the conviction is sustained.

Based on the foregoing reasoning, the judgment of the circuit court of Will County is affirmed.

Affirmed.

ALLOY and BARRY, JJ., concur.