THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WAGES, Defendant-Appellant.

First District (5th Division)   No. 1—91—2521

Opinion filed April 8, 1994.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Julie Line Bailey, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

A jury convicted Michael Wages (defendant) of two counts of first degree murder after which the trial court sentenced him to mandatory natural life imprisonment. Defendant appeals.

The issues presented for review are (1) whether the State proved beyond a reasonable doubt that defendant shot and killed the two victims, (2) whether the State committed reversible error during closing argument by commenting on facts that were allegedly not in evidence and by making allegedly improper inferences from the record, and (3) whether defendant's mandatory natural life imprisonment sentence violated the eighth and fourteenth amendments to the United States Constitution.

## BACKGROUND

Russell Woods (Mr. Woods) testified that on August 26, 1990, he had gone to a party in a row house on 38th Street. (All addresses hereinafter relate to the Ida B. Wells housing project buildings and row houses.) While there, he realized that his beeper was missing. He looked for his beeper but to no avail. He then left the party with his brother and Dion Bill. Outside, Dion Bill (Mr. Bill) got into an argument with a person named Rashid. Rashid pulled out a gun and

put it against Mr. Bill's head. This altercation ended without incident.

As they walked away, Mr. Woods heard shooting coming from the party's vicinity. He ran into the 730 building. The shooting stopped. His sister's boyfriend told him to come outside. Mr. Woods obliged and they went outside to the playground between the 730 and 706 buildings where they talked.

Derrick Reliford, Ricky Johnson, and Michael Bush came into the playground. Mr. Woods saw defendant, whom he had known since grammar school, enter the playground from the 730 building. Defendant was wearing dark shorts. Defendant spoke with Derrick Reliford, Ricky Johnson, and Michael Bush (Mr. Bush). Mr. Woods could not hear any of their conversation but thought that they were talking about belongings which had been taken from defendant. Previously, defendant told Mr. Woods that Derrick Reliford and Ricky Johnson had stuck him up.

Mr. Woods heard gunshots and saw defendant shoot Derrick Reliford and then Ricky Johnson. At first, defendant shot each once. Then defendant fired two more shots at Derrick Reliford and two more shots at Ricky Johnson. Defendant kept pulling the trigger of his gun, but the gun only made a clicking sound. Derrick Reliford and Ricky Johnson (victim or victims) fell to the ground.

When the shooting started, Mr. Woods saw Mr. Bush fall to the ground and yell, "This is Mike, man. I didn't do nothing to you." Next, he saw Mr. Bush pass out and when Mr. Bush regained consciousness, he ran to the 3833 building.

After the shooting ceased, Mr. Woods testified that defendant ran away. Defendant was the only person who had a gun in the playground. Defendant's gun was black.

Michael Bush testified that he was 17 years old at the time of the shooting and that on August 26, 1990, around midnight, he was with the victims between the 730 and 3833 buildings in the playground. There had been a lot of shooting earlier in this area. One victim was standing between the slides, Mr. Bush was at a yellow bench, and the other victim was on an orange bench.

Mr. Bush heard gunshots which sounded very close. He darted toward the gate. After the first three shots, he dove to the ground. He then put his hands over his head and yelled, "This is Mike. This is Mike." He saw some people standing next to the building gate. He noticed that one victim was on the ground. He then blacked out. When he regained consciousness, he saw the two bodies on the ground and ran. Before he blacked out, he saw someone wearing a red shirt and dark pants run past him. Mr. Bush did not see anyone in the

playground that night with a gun. He did not see either victim with a gun. He did not remember seeing Mr. Woods or Bobbi Curtis at the playground that night.

Mr. Bush ran from the playground toward the 3833 building, where he saw Angela Howard and her two friends. He told them that the victims had been shot in the playground. He then ran home and stayed there until the police arrived.

Later that morning, Mr. Bush went to the police station and viewed a lineup and recognized Charles Thompson, whom he had known from the neighborhood. He had seen him earlier that night before the shooting. Mr. Bush told the police that Charles Thompson was not the shooter because Thompson was wearing a white jacket and pants and the shooter wore red.

Angela Howard (Ms. Howard) testified that on August 26, 1990, she was in the playground behind the 730 building of a housing project, with Willie Currie. She saw the victims and a girl named Shawn. Ms. Howard and Willie Currie left the playground and went in separate directions. Ms. Howard went to the 3833 building. She began talking with Angie Ware and Veronica Lanier at the gate to the building. The three women went to Ms. Howard's grandmother's house at 610 East 38th Street. They were outside when Ms. Howard heard gunshots emanating from a close range.

Later, they went to the 727 high-rise building and stood in the playground. While there, she heard more gunshots coming from between the 730 and 706 buildings in the 730 playground. Ms. Howard saw the victims and Mr. Bush in the playground. She saw a short, dark person standing in front of them whom she could not identify.

At first, Ms. Howard heard three gunshots. Then she heard three more shots after which Mr. Bush came from behind her and said that "Derrick [Reliford] and Ricky [Johnson] just got shot." Mr. Bush was in a frightened and nervous state. Ms. Howard went into the playground and saw the two victims lying on the ground.

Bobbi Curtis (Ms. Curtis) testified that on August 25, 1990, she was with her friend Lorraine Dudley (Ms. Dudley). She knew defendant from seeing him around the neighborhood. At around 12:30 a.m. on August 26, 1990, she was in the 730 building and saw defendant. She and Ms. Dudley went to the playground. There, Ms. Curtis saw the two victims and Mr. Bush. Ms. Dudley talked with one of the victims and the two women started walking to a store. She looked back and saw defendant walking towards the victims and Mr. Bush carrying a black gun. As she walked away, she heard gunshots that were in close proximity to her. She saw the victims lying on the ground and defendant running toward the 730 building carrying a gun.

Officer Michael Jamison (Officer Jamison) of the Chicago police department interviewed Ms. Dudley, Ms. Curtis, and Mr. Bush about the double murders. Mr. Bush stopped Officer Jamison and said that he wanted to talk to him. Mr. Bush told him that he saw a guy named "Black Mike" shoot two guys in the playground. He pointed out the building and floor where defendant lived. Officer Jamison went to this apartment and, after determining that it belonged to defendant, left his card. On August 28, 1990, defendant came to the police station with his mother. Defendant was charged with the murders of the victims.

Detective Ward also spoke with Antoine Whitehorn (Mr. Whitehorn), who went to the police station. At that time, he was a suspect. Detective Ward was able to determine that there had been two separate shooting incidents on the night of August 25, 1990. He asked Mr. Whitehorn if he knew "Little Black Mike." Whitehorn told Detective Ward that defendant was known as "Little Black Mike." Mr. Whitehorn then gave Detective Ward "Little Black Mike's" name and address. Detective Ward went to that address, determined that it was defendant's house, and also left his business card.

Detective Ward learned on August 28, 1990, that defendant was at the police station. He asked Mr. Bush to come to the station but he refused out of fear for his life. Detective Ward heard that Ronnie Weston also witnessed the shooting; however, he also refused to talk to the police.

An assistant Cook County medical examiner performed autopsies on the victims and determined that both died from multiple gunshot wounds. One victim had been shot at close range. Each victim had been shot three times.

Shirley Reliford (Ms. Reliford), a victim's sister, testified for the defense. She had been at the 727 building at the time of the shooting. Ms. Reliford explained that she was visiting a friend in a third-floor apartment when she heard gunshots outside in the playground. She went to the window. She did not see the shooting. Ms. Reliford testified that she saw Charles Thompson (Mr. Thompson) with a jacket wrapped under his arm which she thought was a gun, but was not sure. She never saw a gun in Mr. Thompson's hands.

Ms. Reliford spoke with the police at the scene of the shooting. She told them that she had been on the third floor looking out of the window. As a result of the shooting, she was emotional and nervous. Because of her hysteria, she thought Mr. Thompson was the shooter. Ms. Reliford testified that she had not told the truth when she told the police that she saw Mr. Thompson and two others in the playground. Ms. Reliford also testified that she did not see Mr. Woods or defendant on the night of the shooting.

Jeweline Smith (Ms. Smith) also testified for the defense. Defendant was her son's close friend. On the night in question, she heard gunfire, which emanated from a party at the row houses, while she was playing cards with friends on the fourteenth floor of her building. She went to her apartment on the eighth floor to see if her daughter was home. She saw boys running in her direction, shooting, with other boys chasing them. There was a shoot-out in the back of the building. The police came and drove around the neighborhood. At that time, no one had been shot.

Later that evening, Ms. Smith was on her porch when she saw four men sitting in the 730 playground. She did not see these four men arrive in the playground. Someone came from the 730 building, dressed in black, and two of the other men left the playground. She testified that the man dressed in black was not defendant because he was taller than defendant. Ms. Smith said that she knew one of the victims but had not recognized him from her eighth-floor porch.

Ms. Smith was unable to identify the hairdos or descriptions of the males she saw in the playground. Nor did she know who any of the four individuals were. She said they were not heavy set and were of medium build. She observed the shooter speak to one of the victims. They shook hands and the man in black turned to leave. The man in black took a few steps, spun around, pulled out a gun, and started shooting. Ms. Smith did not know what type of gun this man used or its size. She was also unable to identify the gun's color. When the man in black started shooting, Ms. Smith jumped back from her window. The next time that she looked out the window, the two victims were on the ground.

Ms. Smith knew the police were investigating the murders of the two victims but never went to the police station. Defendant's mother had come through the building and asked the neighbors questions about the shooting. Ms. Smith learned that defendant was charged with the murders, but did not go to the police. She never talked to the police. She contended that she would have testified against defendant had she seen him shoot the victims.

Following trial, the jury found defendant guilty of first degree murders of the two victims. The trial court sentenced defendant to mandatory life imprisonment. Defendant appealed.

OPINION

I

Defendant contends that the State did not prove him guilty of two counts of first degree murder beyond a reasonable doubt because

(a) there existed no physical evidence linking him to the shootings, (b) identification testimony was weak and inconsistent, and (c) the State's witnesses were impeached. We disagree.

On review, a criminal conviction will not be set aside on the grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Tye* (1990), 141 Ill. 2d 1, 13, 565 N.E.2d 931.) And, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence all lie within the jury's province (*People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837), even where inconsistencies exist. *People v. Aguilar* (1991), 218 Ill. App. 3d 1, 8, 578 N.E.2d 109.

Convictions may even be sustained upon circumstantial evidence, and to prove guilt beyond a reasonable doubt, a jury need not disregard the inferences that flow normally from the evidence before it. *People v. Halmon* (1992), 225 Ill. App. 3d 259, 278, 587 N.E.2d 1182.

Thus, the relevant inquiry in determining whether a defendant was proven guilty of an offense beyond a reasonable doubt is:

> "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

See also *People v. Tye* (1990), 141 Ill. 2d 1, 14, 565 N.E.2d 931, 937; *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.

In the instant case, the trier of fact convicted defendant of two counts of first degree murder:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> >
> > (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another ***." Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a) (now 720 ILCS 5/9—1(a) (West 1992)).

The State presented Mr. Woods, who testified that he saw defendant shoot each victim three times. Ms. Howard testified that she saw the two victims and Mr. Bush in the 730 playground with someone who was in front of them. This person was short and dark. She heard six gunshots, and Mr. Bush ran up to her and stated that the victims had just been shot. Mr. Bush corroborated this testimony. He

testified that he was in the playground with the two victims when he heard gunshots and passed out. When he regained consciousness, he saw someone wearing a red shirt and dark pants run by him. He ran from the playground and told Ms. Howard what had transpired.

Further, Officer Jamison testified that Mr. Bush stopped him and told him that he saw "Black Mike" shoot two guys in the playground. He also pointed out where defendant lived. Mr. Bush also told police that Mr. Thompson was not the shooter because he was wearing a white jacket and pants and the shooter wore red.

Ms. Curtis corroborated that Mr. Bush was in the playground and that she had earlier been in the playground with the two victims, another woman, and Mr. Bush. As she was leaving the playground, she saw defendant, who was carrying a black gun and walking towards the victims and Mr. Bush. She heard gunshots and saw the two victims lying on the ground and defendant absconding.

Although she did not actually see defendant shoot the victims, inferences from her testimony, coupled with the rest of the evidence, demonstrate that defendant shot and killed the two victims.

Moreover, Mr. Woods observed defendant go into the playground wearing dark shorts. This is what other witnesses said the shooter was wearing. Woods had known defendant since grammar school. He observed defendant shoot the victims three times each. He also saw Mr. Bush with the two victims and told police that the shooter was "Black Mike." According to Mr. Woods, defendant went by the nicknames "Money," "Mike," and "Black Mike." Just because some witnesses did not remember whether Mr. Woods was in the playground at the time of the murders does not mean that defendant was not the shooter.

Juxtaposed to the State's witness testimony is that of the defense. Ms. Smith testified that she saw the shooting from the porch of her eighth-floor apartment. She also stated that the perpetrator was taller than defendant and that she would not have had any qualms identifying defendant as the killer had she seen him commit the crimes. The jury had the opportunity to digest this information, form an opinion on the credibility of all of the witnesses, and weigh the facts, and it found defendant guilty of the two murders.

We may not usurp the jury's function, here, because we hold that a reasonable jury could have found defendant guilty of two counts of first degree murder beyond a reasonable doubt.

## II

Defendant next contends that the prosecutor committed reversible error during closing argument by commenting on facts that were

allegedly not in evidence and by making improper inferences from the record. Specifically, defendant asserts that (a) the prosecutor painted in the jurors' minds the notion that the witnesses were afraid to testify and that there was no evidence that anyone was threatened, (b) the prosecutor erred by making comments concerning nicknames, (c) the prosecutor erred by implying that defendant had a motive to kill decedents, and (d) the prosecutor erred by stating that defendant was a friend of one of the State's witnesses. Defendant alternatively claims that the cumulative effect of these errors constituted reversible error. We disagree.

The State, on the other hand, alleges that these issues were waived and, if not waived, the comments were harmless. It is true that an issue is waived for purposes of appeal unless there is an objection made during the trial and the error is specified in a motion for a new trial. (*People v. Enoch* (1991), 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124.) Nevertheless, we will address these issues anyway.

Prosecutors must confine their arguments to the evidence and to reasonable inferences flowing from it. *People v. Linscott* (1991), 142 Ill. 2d 22, 38, 566 N.E.2d 1355.

However, attorneys are allowed considerable leeway in making closing arguments, the parameters of which fall within the trial court's discretion. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 312, 570 N.E.2d 344.) And, such comments will not be reversed on appeal absent a demonstration of abuse of that discretion or substantial prejudice to the defendant (*People v. Brandon* (1990), 197 Ill. App. 3d 866, 885, 557 N.E.2d 1264), if absent those remarks the verdict would not have been different. *People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970.

Defendant first alleges that the prosecutor "attempted to plant in the jurors's [*sic*] minds the notion that the witnesses had been reluctant to come forward because they were afraid to cooperate with the police." The prosecutor stated:

> "You have also gotten a slice of life of what these people, these witnesses, live in, in these projects, very high crime area. These people suffer in these projects from the volatile situation where shootings are common, where many people have guns; and when you look at the witnesses' testify [*sic*], I would like you to keep that in mind when you [*sic*] who [*sic*] at the people people [*sic*] that came here and testified for the People of the State of Illinois and risked their safety to take that stand, point out the man they saw kill two people in cold blood on the play lot."

Defendant also takes issue with the following comments made by the prosecutor:

"You heard from the police officers that at one point they went out to his [Woods] house and tried to bring him in to talk more in detail about Michael Wages, and he refused to come in. He was afraid to come in. He. didn't want to be seen walking out of this highly-congested, very crowded area with police officers. Everybody knows who the police are around there, and everybody knew that the police were all over those projects looking for witnesses for this [sic] murder [sic].

He didn't want to be one of the people seen walking out with the police that day. And it's very understandable why."

Defendant cites *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900, as supporting case law. In *Smith*, the defendant was on trial for murdering a prison official. The State attempted to prove that the killing of the victim was an assassination carried out by gang members. The State's argument implied that two witnesses had been forced, by threat or otherwise, to leave Chicago:

"[E]very witness that had the guts to come in here and say what he or she saw, every witness that had the guts to point the finger at this defendant, every witness that had the guts to tell the police this is the guy, had to leave town." *Smith*, 141 Ill. 2d at 66.

In finding error, the *Smith* court stated:

"Of course, any attempt to intimidate a witness is admissible as . suggesting a consciousness of guilt [citation] but here the remarks were improper because there was nothing in the evidence suggesting that either [witness] had to leave town or why they may have had to leave." (Emphasis omitted.) (*Smith*, 141 Ill. 2d at 66-67.)

The *Smith* court found that the comment made by the prosecutor compounded the fundamental flaws which permeated the trial. They had no basis in evidence. However, such was not the case here and *Smith* is distinguishable.

■ Two witnesses told the police they were afraid to speak with them. Mr. Bush did not view a second police lineup because his mother was afraid for him. Mr. Bush was also afraid. He feared for his life. The second witness to tell police that she was afraid was Ms. Curtis. She told police that she was afraid to come to the police station because the word on the street was that defendant was under arrest for the two murders in the playground. Ms. Curtis had to be relocated because she testified in this case.

Therefore, the prosecutor's comments were proper because they were based on the evidence and it could have been reasonably inferred from the evidence that the witnesses were afraid for their safety and that they took risks by testifying against defendant, especially since Ms. Curtis had to relocate because she testified.

The second error alleged by defendant relates to the comments that the prosecutor made about nicknames. The prosecutor commented:

"[Angela Howard] told you nicknames. Everybody has nicknames almost. The defendant is Little Black Mike or Money. The victims were Slick and Dog. Even Mrs. Smith was Miss Pompei [*sic*]."

Defendant claims that the prosecutor's comment made "it appear that Ms. Howard supplied the defendant's nicknames and not Michael Bush and Russell Woods, who both were offenders." Defendant continued that only Mr. Woods, whom no other witness saw at the scene, supplied the name "Money" as the shooter and that the prosecutor therefore drew impermissible inferences from the record and bolstered his case by implying that Ms. Howard had named defendant as the murderer when she had not. "Furthermore, the prejudice from this error was exacerbated by the prosecutor's remark that Mr. Bush supplied Officer Jamison with the name of Michael Wages. *** On the contrary, Officer Jamison testified that Michael Bush named Black Mike as the shooter. *** At trial, Bush denied supplying any name to the police. *** Thus, the prosecutor's remarks about nicknames were not justified and were highly prejudicial."

■ However, we find that the prosecutor's comments about nicknames did not make it appear as though Ms. Howard supplied defendant's nicknames to the police. All that the prosecutor said was that Ms. Howard supplied nicknames, which she did. Any inferences drawn from this comment were acceptable because they were based on the evidence. Further, the evidence established that Mr. Bush identified the shooter as "Black Mike." Defendant was known as Black Mike. Therefore, such comment was proper.

Defendant's third alleged error was that the prosecutor "bolstered the State's weak motive evidence by arguing:

'Basically everybody that testified knew what was going on and why Michael Wages was mad and why he went out for revenge that night.' "

Defendant claims that there is no basis for this statement because the only person who claimed to have heard anything said between the victims and the shooter was Mr. Woods. Mr. Woods claimed that the shooter was seeking revenge because the two victims had stolen his jewelry. Defendant states that by using the word "everybody," the State's comment on motive improperly bolstered its case and was highly prejudicial to the defense.

■ However, this comment was properly inferred from the evidence. Mr. Woods testified that he knew that defendant had been

stuck up by the two victims because defendant had "come back and told us." Thus, the prosecutor's comments were properly inferred from the evidence. Assuming *arguendo* that the comment constituted error, we find that it was harmless.

Defendant's fourth alleged error is that the prosecutor stated that defendant was a friend of Mr. Woods:

> "PROSECUTOR [Mr. Cernius]: Any reason they would come in here and say let's put this case on Michael Wages because we don't like him? In fact, the opposite is true. You heard Russell Woods say that he's a friend of Michael Wages?
>
> DEFENSE COUNSEL [Mr. Sherman]: Objection. That's not the testimony.
>
> THE COURT: Ladies and Gentlemen, again you heard the testimony. You decide what you heard, what you didn't hear."

Defendant states that Mr. Woods merely testified that he had known Michael Wages since grammar school and did not describe himself as defendant's friend.

■ Such a statement could have been inferred from the evidence adduced at trial. Woods had known defendant since grammar school and defendant told Woods that he had been stuck up by the two victims. From such testimony, it could have been inferred that Woods and defendant were friends. Nothing in the evidence demonstrated that Woods had a motive to implicate defendant.

Even if this could not have been inferred, minor discrepancies in the evidence are an insufficient basis upon which to set aside a finding of guilt where, as in this case, the finding is supported by the totality of the evidence beyond a reasonable doubt. (*People v. Draper* (1979), 79 Ill. App. 3d 749, 754, 398 N.E.2d 1023.) Moreover, motive is immaterial when the evidence establishes beyond a reasonable doubt that the defendant killed the victim. It is not an essential element of the crime of murder. (*Draper*, 79 Ill. App. 3d at 756.) Assuming *arguendo* that such comment constituted error, it was harmless.

■ Finally, defendant claims that the cumulative effect of the errors constituted reversible error. It is true that trial errors may have a cumulative effect when considered together. (*People v. Albanese* (1984), 102 Ill. 2d 54, 83, 464 N.E.2d 206.) However, we agree with the *Albanese* court:

> "The whole can be no greater than the sum of its parts, and defendant has failed to demonstrate anything approaching reversible error in the myriad of arguments offered to justify a new trial." (*Albanese*, 102 Ill. 2d at 82-83.)

Nor did any error in the instant case justify a reversal of the jury's verdict.

## III

Defendant alleges that defendant's mandatory natural life imprisonment sentence violates the eighth and fourteenth amendments to the United States Constitution. We disagree.

The trial court sentenced defendant to mandatory life imprisonment pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(c) (now 730 ILCS 5/5—8—1(a)(1)(c) (West 1992))). Under this statute:

"if the defendant,

\*\*\*

is found guilty of murdering more than one victim, \*\*\* \*\*\*

\*\*\* the court shall sentence the defendant to a term of natural life imprisonment."

The Illinois Supreme Court has held that a judge's only discretion in a case involving conviction for multiple homicides is whether or not to impose the death penalty. If he chooses not to impose the death penalty, the judge must follow the statute, which "unequivocally mandates natural life imprisonment for the murder of two or more persons." *People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 336, 518 N.E.2d 1047.

Here, the jury convicted defendant of two murders, and since he was 15 at the time of the murders, he was not eligible for the death penalty. Thus, the mandatory life imprisonment sentence is required.

■ The mandatory life imprisonment sentence provision has repeatedly withstood attacks as to its constitutionality. (*People v. Taylor* (1984), 102 Ill. 2d 201, 205-07, 464 N.E.2d 1059; *People v. Knott* (1991), 224 Ill. App. 3d 236, 261-62, 586 N.E.2d 479; *People v. Matthews* (1990), 205 Ill. App. 3d 371, 416, 562 N.E.2d 1113; *People v. Winchel* (1987), 159 Ill. App. 3d 892, 921-22, 512 N.E.2d 1298; *People v. Walker* (1985), 136 Ill. App. 3d 177, 182, 483 N.E.2d 301; *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 592-94, 480 N.E.2d 1147.) The trial judge has no discretion to impose any lesser sentence of imprisonment under section 5—8—1(a)(1)(c). *Strayhorn*, 119 Ill. 2d at 336.

The legislature has the power to declare and define conduct constituting a crime and to determine the nature and extent of punishment for it. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 500, 431 N.E.2d 344.) Such legislation will not be nullified by courts unless it violates a constitutionally assured right. (*Taylor*, 102 Ill. 2d at 205.) Moreover, there is a strong presumption as to the validity of legislative classifications. *Taylor*, 102 Ill. 2d at 206.

In *Taylor*, the Illinois Supreme Court found that it is within the

province of the legislature to define criminal conduct and the nature of punishment to be imposed unless the statute is in clear violation of constitutional rights. The *Taylor* court found:

"The rehabilitative objective of [the constitution] should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders. *** We cannot say that the penalty called for in section 5—8—1(a)(1)(c) violates [the constitution]." *Taylor*, 102 Ill. 2d at 206.

Similarly, the Illinois Supreme Court in *Strayhorn* found that, after exercising its discretion to reject the death penalty, the trial court had no further discretion because "[t]he statute unequivocally mandates natural life imprisonment for the murder of two or more persons." *Strayhorn*, 119 Ill. 2d at 336.

Moreover, the United States Supreme Court in *Harmelin v. Michigan* (1991), 501 U.S. 957, 115 L. Ed. 2d 836, 111 S. Ct. 2680, rejected the argument that it is cruel and unusual punishment to impose a mandatory term of life imprisonment without the possibility of parole, without any consideration of mitigating factors. (*Harmelin*, 501 U.S. at 994, 115 L. Ed. 2d at 864-65, 111 S. Ct. at 2701.) The Court stated:

"As our earlier discussion should make clear, this claim [mandatory life imprisonment is cruel and unusual punishment] has no support in the text and history of the Eighth Amendment. Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense ***." *Harmelin*, 501 U.S. at 994-95, 115 L. Ed. 2d at 864, 111 S. Ct. at 2701.

In the case at bar, the fact that defendant was 15 years old at the time that he committed the two murders is irrelevant. In *Taylor*, the natural life imprisonment statute was held constitutional when applied to a 15-year-old juvenile. In *Rodriguez*, a 16-year-old's natural life sentence was held to pass constitutional muster.

The plain meaning of the statute is that, regardless of age, a defendant found guilty of murdering more than one victim must be sentenced to a term of natural life imprisonment. The jury found defendant guilty of two murders. The trial court's sentence falls within the ambit of the statute. Thus, defendant must spend the remainder of his natural life in prison.

Judgment affirmed.

GORDON and McNULTY, JJ., concur.